*Decision will be entered under Rule 50.*

E. WARD KING AND MYRTLE C. KING, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4084–68—4097–68.    Filed January 28, 1971.

[1] By joint motion of the parties granted by the Court, cases of the following petitioners are consolidated herewith: E. William King and Mary P. King, docket No. 4085–68; Edward William King, Jr., Trust, E. William King, Trustee, docket No. 4086–68; Elizabeth Madison King Trust, E. William King, Trustee, docket No. 4087–68; Mary Armistead King Trust, E. William King, Trustee, docket No. 4088–68; John R. King and Jane S. King, docket No. 4089–68; Jennifer Stewart King Trust, John R. King, Trustee, docket No. 4090–68; John Rutledge King, Jr., Trust, John R. King, Trustee, docket No. 4091–68; Edwin O. Norris and Margaret K. Norris, docket No. 4092–68; Cheryl Ann Norris Trust, Margaret K. Norris, Trustee, docket No. 4093–68; Laura Charlton Norris Trust. Margaret K. Norris, Trustee, docket No. 4094–68; Edwin Ward Norris Trust, Margaret K. Norris, Trustee, docket No. 4095–68; S. T. King and Ruth King, docket No. 4096–68; and Lloyd W. Pendleton and Elizabeth B. Pendleton, docket No. 4097–68.

*John Y. Merrell* and *F. Allan Kelly*, for the petitioners.
*Vallie C. Brooks*, for the respondent.

STERRETT, *Judge:* The respondent determined deficiencies in the Federal income taxes of petitioners in these consolidated case for the year 1963 as follows:

| Docket No. | Deficiency | Docket No. | Deficiency |
|---|---|---|---|
| 4084–68 | $130,945.51 | 4091–68 | $17,455.84 |
| 4085–68 | 168,462.24 | 4092–68 | 159,859.98 |
| 4086–68 | 17,455.78 | 4093–68 | 17,189.59 |
| 4087–68 | 17,455.78 | 4094–68 | 8,350.46 |
| 4088–68 | 8,350.46 | 4095–68 | 2,096.59 |
| 4089–68 | 171,652.81 | 4096–68 | 24,818.26 |
| 4090–68 | 17,455.84 | 4097–68 | 593.30 |

The sole issue presented for our determination is whether the distribution of all of the stock of three of its wholly owned subsidiaries by the Mason & Dixon Lines, Inc., to its shareholders qualified for nonrecognition of gain under section 355 of the Internal Revenue Code of 1954.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations and the exhibits attached thereto are incorporated herein by this reference.

The following petitioners are husband and wife, respectively, all of whom resided in Kingsport, Tenn., at the time their petitions were filed herein, and filed joint income tax returns for the year 1963 with the district director of internal revenue at Nashville, Tenn.

| | Docket No. |
|---|---|
| E. Ward King and Myrtle C. King | 4084–68 |
| E. William King and Mary P. King | 4085–68 |
| John R. King and Jane S. King | 4089–68 |
| Edwin O. Norris and Margaret K. Norris | 4092–68 |
| S. T. King and Ruth King | 4096–68 |
| Lloyd W. Pendleton and Elizabeth B. Pendleton | 4097–68 |

E. William King, John R. King, and Margaret K. Norris are the adult children of E. Ward King and Myrtle C. King. S. T. King is the brother of E. Ward King. Lloyd W. Pendleton and Elizabeth B. Pendleton are unrelated to any other petitioner.

---

[2] All references by section are to the Internal Revenue Code of 1954 unless otherwise stated.

The following petitioners are Tennessee trusts created by E. Ward King, grantor, on the dates indicated. The address of each trust was in Kingsport, Tenn., at the time petitions were filed herein, and each trust filed a fiduciary income tax return for the year 1963 with the district director of internal revenue at Nashville, Tenn.:

|  | Date trust created | Docket No. |
|---|---|---|
| Edward William King, Jr., Trust, E. William King, trustee_ | 2/15/55 | 4086-6 |
| Elizabeth Madison King Trust, E. William King, trustee___ | 2/15/55 | 4087-6 |
| Mary Armistead King Trust, E. William King, trustee_____ | 3/21/58 | 4088-6 |
| Jennifer Stewart King Trust, John R. King, trustee_____ | 1/14/55 | 4090-6 |
| John Rutledge King, Jr., Trust, John R. King, trustee_____ | 2/28/55 | 4091-6 |
| Cheryl Ann Norris Trust, Margaret K. Norris, trustee_____ | 12/21/56 | 4093-6 |
| Laura Charlton Norris Trust, Margaret K. Norris, trustee__ | 6/18/58 | 40948- |
| Edwin Ward Norris Trust, Margaret K. Norris, trustee____ | 12/22/61 | 40958- |

The various trust beneficiaries are the minor children of the respective trustees and are the grandchildren of E. Ward King.

The Mason & Dixon Lines, Inc. (hereinafter referred to as Mason & Dixon), was incorporated under the laws of the State of Tennessee on January 5, 1934. Since its incorporation, Mason & Dixon has been engaged in business as a motor common carrier of property in interstate commerce. It has been under the regulatory jurisdiction of the Interstate Commerce Commission (hereinafter referred to as ICC) since the Federal Motor Carrier Act became effective in 1935. Since 1934 Mason & Dixon's principal office has been located in Kingsport, Tenn. For each of the taxable years 1950 through 1966, Mason & Dixon filed Federal income tax returns with the district director of internal revenue at Nashville, Tenn. For the years 1957 through 1961, Mason & Dixon filed consolidated income tax returns with its subsidiaries.

E. Ward King was a founder of Mason & Dixon and his family has controlled this corporation since 1939. M. & D. Investment Co., Inc. (hereinafter referred to as M. & D. Investment), was incorporated under the laws of Tennessee on October 20, 1941. The Crown Enterprises, Inc. (hereinafter referred to as Crown), was incorporated under the laws of Tennessee on May 29, 1957. M. & D. Investment, since its incorporation, has been engaged in the business of acquiring, improving, and leasing real property to others. Crown was organized for the purpose of renting automotive equipment and prior to October 4, 1963, it engaged primarily in this activity.

Other than an issue of Mason & Dixon preferred stock, Crown, M. & D. Investment, and Mason & Dixon have only one class of

capital stock outstanding which constitutes the voting stock of said corporations. The owners of the common (voting) stock of these corporations and their respective holdings on October 4, 1963, were as follows:

| Shareholder | Number of shares | | |
|---|---|---|---|
| | Mason & Dixon | Crown Enterprises | M. & D. Investment |
| E. Ward King | 1,847 | 2,500 | 614½ |
| E. William King | 2,384 | 2,500 | 6½ |
| E. William King, trustee for Edward William King, Jr | 400 | | |
| Elizabeth Madison King | 400 | | |
| Mary Armistead King | 245 | | |
| John R. King | 2,384 | 2,500 | 6½ |
| John R. King, trustee for Jennifer Stewart King | 400 | | |
| John Rutledge King, Jr | 400 | | |
| Margaret K. Norris | 2,304 | 2,500 | 46½ |
| Margaret K. Norris, trustee for Cheryl Ann Norris | 400 | | |
| Laura Charlton Norris | 245 | | |
| Edward Ward Norris | 100 | | |
| Edwin O. Norris | | | 41 |
| S. T. King | 482 | | |
| Lloyd W. Pendleton | 30 | | |
| King Foundation | 479 | | |
| Total outstanding | 12,500 | 10,000 | 715 |
| Par value per share | $10 | $10 | $100 |

Since December 31, 1954, Mason & Dixon has had outstanding 3,750 shares of 6-percent cumulative preferred capital stock with a par value of $100 per share. Such stock has no voting rights and participates in the earnings of the corporation only to the extent of its 6-percent dividends.

On October 4, 1963, Mason & Dixon owned all of the outstanding stock of the Mason & Dixon Tank Lines, Inc. (hereinafter referred to as Tank Lines), Interstate Investment Corp. (hereinafter referred to as Interstate), Motorways Investment Corp. (hereinafter referred to as Motorways), and the Regal Corp. (hereinafter referred to as Regal). Tank Lines is a motor common carrier of commodities in bulk, in tank vehicles, between points in several States. It is not a party to any of the transactions under consideration in this case.

Mason & Dixon started with nothing in 1932. It was incorporated in 1934 with capital of less than $11,000 and progressed until World War II. During the war years conditions were difficult in the transportation industry and Mason & Dixon lost money. After the war it commenced a period of rapid growth and expansion and by 1950 it had outgrown its terminal facilities.

The operation of a motor freight carrier revolves around its terminals. The terminal represents the carrier in the particular area in which the terminal is located. From the terminal the carrier handles

all matters in that area, which includes the solicitation of freight, the handling of bills, and the collection of revenues. The greater portion of the routine work revolving around the terminal is in the handling of freight. When freight is picked up on behalf of the motor carrier, it is taken to the terminal, transferred to intercity trucks, and dispatched to other cities. Conversely, the carrier handles freight coming from other cities in its terminal, transfers the freight to pickup and delivery trucks, and delivers to consignees in the city and surrounding areas in which the terminal is located. Where the distance between the terminals of a motor freight carrier is too great for one driver to drive in a normal workday, the carrier establishes a relay station between the terminals so that a driver can terminate his run and another driver can take the truck on to its destination. A relay station is a place containing only a small office, limited facilities for servicing equipment, and sleeping quarters for the drivers. Its physical size is considerably smaller than a terminal facility.

Mason & Dixon has always followed a policy of maintaining attractive terminal facilities and attractive and clean equipment on the highways in order to create a good public image. It was the opinion of the owners and operators of Mason & Dixon that adequate terminal facilities were essential to the successful operation of their motor freight company.

The existing terminal facilities available to Mason & Dixon in the late 1940's and early 1950's were too small and poorly designed, and it was apparent that new terminals would have to be constructed. Efforts were made to interest other parties to build terminals and lease them to Mason & Dixon. Such parties would agree to do so only if Mason & Dixon would enter into a long-term lease under which the lessee would pay all maintenance, taxes, insurance, and utilities, make a rent deposit of the last 1 or, in some cases, 2 years' rent in advance, and pay a monthly rent of approximately 1 percent of total cost per month. In addition, Mason & Dixon was required to supply complete financial data, such as balance sheets, operating statements, and supporting documents to enable the builder-lessor to borrow the funds to construct the terminal. Any outside party undertaking construction of motor freight terminals would require the above-described sort of arrangement because said terminals are single-purpose facilities which require specialized equipment and construction.

For the taxable year 1950 Mason & Dixon reported net income before taxes of $717,355.01 on gross receipts of $9,037,485.67 on its Federal income tax return for that calendar year.

The balance sheet of Mason & Dixon, as filed with its income tax return for 1950, as of December 31, 1950, was as follows:

BALANCE SHEET

*Assets*

| | | |
|---|---:|---:|
| Cash | | $204, 215. 94 |
| Notes and accounts receivable | $536, 662. 14 | |
| Less: Reserve for bad debts | 6, 138. 33 | 530, 523. 81 |
| Inventories: | | |
| Supplies | | 160, 824. 82 |
| Other investments: | | |
| Ridgefields | 6, 000. 00 | |
| Interstate Investment Corp | 230, 500. 00 | 236, 500. 00 |
| Capital assets: | | |
| Depreciable assets | 2, 462, 341. 00 | |
| Less: Reserve for depreciation | 1, 068, 359. 52 | 1, 393, 981. 48 |
| Land | | 33, 036. 90 |
| Other assets: | | |
| Deferred charges | 62, 425. 51 | |
| Special deposits | 18, 805. 00 | |
| Cash value life insurance | 11, 000. 00 | 92, 230. 51 |
| Total assets | | 2, 651, 313. 46 |

*Liabilities*

| | | |
|---|---:|---:|
| Accounts payable | | 466, 923. 38 |
| Bonds, notes, and mortgages payable: | | |
| With original maturity of 1 year or more | | 574, 103. 47 |
| Accrued expenses: | | |
| Wages | $94, 528. 72 | |
| Taxes (except Fed. inc. & EP) | 47, 355. 83 | 141, 884. 55 |
| Other liabilities, including Fed. inc. & EP tax | | 366, 655. 97 |
| Capital stock: | | |
| Common stock (1,250 shares) | | 125, 000. 00 |
| Paid-in or capital surplus | | 986. 41 |
| Earned surplus and undivided profits | | 975, 759. 68 |
| Total liabilities | | 2, 651, 313. 46 |

After considerable investigation over a period of several months, the management of Mason & Dixon realized that any outside party would be constructing terminals on the cash and credit of Mason & Dixon.

In 1950, section 214 of the Interstate Commerce Act provided that a motor common carrier could not issue short-term notes or evidences of indebtedness for more than $100,000 or securities with a maturity in

excess of 2 years, if such securities, the securities already outstanding, and the value of the carrier's capital stock exceeded $500,000, without the approval of the ICC. Consequently, Interstate was incorporated in Tennessee on July 3, 1950. Its capitalization of $120,000 consisted of 1,200 shares of stock with a par value of $100 per share, and all of its outstanding stock was owned by Mason & Dixon from the date of incorporation until October 4, 1963. All such stock was fully paid by Mason & Dixon on July 12, 1950, in the amount of $120,000. Under its corporate charter, Interstate was authorized to engage in all aspects of the real estate business. Interstate was not subject to the jurisdiction of the ICC. From its incorporation through October 4, 1963, E. Ward King was president, treasurer, and director of Interstate, while E. William King was vice president and director, and John R. King was secretary and director.

On February 1, 1951, Interstate purchased from Mason & Dixon an existing terminal at Secaucus, N.J., and a relay station at Verona, Va., for amounts equal to the adjusted bases of the properties. The Secaucus terminal was leased back to Mason & Dixon on June 1, 1951.

Interstate acquired land, constructed terminals, and leased them to Mason & Dixon as follows:

| Location | Date of lease |
| --- | --- |
| Chattanooga, Tenn | Sept. 29, 1950 |
| Philadelphia, Pa | Mar. 19, 1951 |
| Atlanta, Ga | May 1, 1951 |

These terminals became inadequate and additions, alterations, and improvements were made. New leases were entered into which superseded the existing leases as follows:

| Location | Date of lease |
| --- | --- |
| Secaucus, N.J | Nov. 17, 1955 |
| Atlanta, Ga | Dec. 28, 1955 |
| Chattanooga, Tenn | Oct. 1, 1957 |
| Philadelphia, Pa | July 21, 1958 |

The procedures followed in the construction of the terminal at Atlanta were typical of those followed in the construction of the other above-mentioned facilities. For the sake of brevity, therefore, we will describe only the one project.

On June 19, 1950, E. Ward King, later to become president of Interstate, purchased land near Atlanta, Ga., in his own name and held it until Interstate could be formed on July 3, 1950. Interstate reimbursed King for the $15,000 purchase price paid for the property and received the property in exchange. Mason & Dixon was going to use the terminal and wanted it designed efficiently for economical operation, so it engaged and paid an architect to draw plans and specifications to suit its needs.

The architect put the job out for public bid. On August 24, 1950, Interstate entered into a contract with D. C. Fowler Co. as general contractor for construction of the Atlanta terminal at a contract price of $123,870, requiring the general contractor to obtain an owner's protective bond in favor of Interstate. Construction progressed normally and was completed in due course at a total cost of $190,802.22; and Interstate paid all such costs as they fell due. In addition to the general contractor, Interstate engaged certain concerns and made substantial payments for excavating and grading, structural steel, engineering services, builder's risk insurance, grading, landscaping, fence installation, and yard paving.

Construction money for the Atlanta terminal was obtained from the Citizens & Southern National Bank, Atlanta, Ga., in the amount of $120,000. This loan was based on a commitment of the Georgia Teachers' Retirement System for a long-term loan of $120,000. $110,000 in construction money was actually borrowed. This amount was repaid on May 14, 1951. The terms of the long-term loan were as follows:

1. Repayable monthly at the rate of $1,000 over a 10-year period with interest.

2. Loan secured by a first mortgage on the property.

3. Satisfactory title policy at cost of Interstate.

4. Adequate insurance acceptable to lender.

5. Assignment of a 10-year lease, acceptable to counsel for lender, from Mason & Dixon to Interstate. The monthly rentals to be adequate to take care of complete amortization of the loan within the 10-year period.

6. Personal endorsement of E. Ward King.[3]

On May 1, 1951, Interstate leased the Atlanta terminal to Mason & Dixon for a term of 12 years at an annual rental of $24,000. Beginning in June 1951 and continuing until December 1955, Interstate collected the rentals from Mason & Dixon and made monthly payments of principal and interest to Teachers' Retirement System of Georgia.

Mason & Dixon's growth rendered the Atlanta terminal inadequate, so, in August 1955, Interstate entered into a contract with J. A. Jones Construction Co. to construct certain additions and alterations at a cost of $112,240.41. As in the case of the original construction, all building matters were handled and paid by Interstate. This work was substantially completed in December of 1955.

On December 22, 1955, Teachers' Retirement System of Georgia

---

[3] This was the only occasion prior to Oct. 4, 1963, upon which the personal endorsement of E. Ward King was required.

extended a new loan of $150,000 to Interstate and the unpaid balance of the old loan was paid from the proceeds. The new loan was secured in the same manner as the prior loan except that the endorsement of E. Ward King was not required and the loan was payable in 40 equal quarterly principal installments plus interest. The installments were paid by Interstate as they fell due and the entire loan was paid on December 22, 1965.

By mutual agreement, the lease dated May 1, 1951, was superseded by a new lease dated December 28, 1955, covering the enlarged property for a period of 10 years beginning January 1, 1956, at a rental of $32,500 per year.

Motorways was incorporated under the laws of Tennessee on February 3, 1953. Its capitalization of $125,000 consisted of 1,250 shares of stock with a par value of $100 per share and all of its outstanding stock was owned by Mason & Dixon from the date of incorporation until October 4, 1963. The original issue of 400 shares was fully paid in cash of $40,000 by Mason & Dixon on February 23, 1953. Additional issues of 500 shares on November 30, 1954, and 350 shares on December 14, 1956, were fully paid by application against cash previously advanced to Motorways by Mason & Dixon. Under its corporate charter Motorways was authorized to engage in all aspects of the real estate business. It was not subject to the jurisdiction of the ICC. From its incorporation until October 4, 1963, E. Ward King was president, treasurer, and director; E. William King was vice president and director; and John R. King was secretary and director.

Properties were acquired, terminals were constructed and leased to Mason & Dixon as follows:

| Location | Date of lease |
|---|---|
| Nashville, Tenn | Nov. 23, 1954 |
| Knoxville, Tenn | Sept. 24, 1956 |

Alterations, additions, and improvements were made on the Nashville property and a new lease was executed on November 23, 1959, and amended on January 1, 1960.

The procedures followed in the construction of the foregoing terminals were substantially identical in all material respects to those followed in the case of the construction of the terminal at Atlanta and hence will not be repeated.

In September of 1952 Interstate had purchased property, known as the Washington County Farm Tenant House, situated on Boone Lake near Kingsport, Tenn. On February 9, 1953, this property was transferred to Motorways at its book value. Since, in 1954, there were almost no hotel facilities in Kingsport, a lodge, known as The Shanty, was constructed on this property. This lodge was on the order of a

residence, but larger, with facilities to sleep 15 or 20 persons, a kitchen and dining room, and several conference rooms. It was used by Mason & Dixon for conferences of regional directors and other employees, for the business entertainment of bankers and others, and to further the business of Mason & Dixon. Employees and guests could sleep and eat there and conduct their business without interruption.

The acquisition, improvement, and leasing of The Shanty was handled in the same manner as other properties of the real estate leasing corporations, except that there was no long-term financing involved and it was a different kind of property. It had a longer, useful life and was subjected to different usage. For this reason the annual rental rate to Mason & Dixon was lower in relation to cost than the rental rate of terminals. The rental rate was sufficient to earn a small profit for Motorways.

In addition to the lodge, some farming operations were conducted on The Shanty property under the supervision of E. Ward King. Some cattle, as well as Shetland ponies, were kept on the property and some corn and tobacco were raised. The farming was not a major operation and it was not profitable. The employee of Mason & Dixon who did the yard work at The Shanty also was employed in the farming operation.

Regal was incorporated in Tennessee on December 17, 1956. Its capitalization of $100,000 consisted of 1,000 shares of stock with a par value of $100 per share and all of its outstanding stock was owned by Mason & Dixon from April 11, 1957, until October 4, 1963. All such stock was originally issued to and fully paid in cash on December 21, 1956, by M. & D. Investment. Mason & Dixon purchased this stock at par and paid the purchase price of $100,000 in full in cash on April 11, 1957. Under its corporate charter, Regal was authorized to engage in all aspects of the real estate business, and it was not subject to the jurisdiction of the ICC.

Property was acquired, terminals constructed and leased to Mason & Dixon as follows:

| Location | Date of lease |
|---|---|
| Greensboro, N.C. | Jan. 25, 1958 |
| Richmond, Va. | June 13, 1958 |
| Charlotte, N.C. | May 6, 1961 |

Again the procedures followed in the construction of the foregoing terminals were substantially identical in all material respects to those followed in the case of the construction of the terminal at Atlanta and hence will not be repeated here.

Interstate, Motorways, and Regal (hereinafter sometimes referred to as the real estate leasing corporations) have never, until the date of trial, sought to lease nor have they leased any terminal to a party other than Mason & Dixon. The leases executed by the real estate leas-

ing corporations and Mason & Dixon all contain substantially identical terms. Mason & Dixon would pay rentals amounting to approximately 12 percent of the cost of the particular building per year. Mason & Dixon would pay all city, county, and State taxes and assessments. Mason & Dixon would pay the expenses of utilities, repairs, maintenance, and insurance. The cost of any future enactment of a Federal excess profits tax was to be borne by Mason & Dixon and if any Federal tax were enacted which would have had the effect of decreasing the lessor's net profits Mason & Dixon was to pay an increased rental. The real estate leasing corporations did not require a rental deposit. Mason & Dixon did make some short-term advances of cash to these corporations. Such advances were generally made at the time of construction and only if Mason & Dixon had the cash available and on the condition that it could have the funds repaid when needed. Interest was not charged on these temporary advances. The parties felt that interest was inappropriate because no rental deposit was required.

From the time of their incorporation until June of 1961, the books and records of the leasing corporations were kept by a salaried employee, James S. Little (hereinafter referred to as Little), who was also an employee of Mason & Dixon. Independent books, records, and bank accounts were kept for each corporation. Little handled all accounting work. In June of 1961 Little's salary was discontinued and employees of Mason & Dixon performed these duties. The real estate leasing corporations paid Mason & Dixon a management fee for these services. Services such as maintenance or repair pertaining to the terminals themselves were either performed by Mason & Dixon employees or were contracted for by Mason & Dixon.

The leasing corporations had no offices, post office box, or telephone. The books and records were kept by Little at the offices of Mason & Dixon. The addresses of the leasing corporations were at Mason & Dixon's offices.

The affairs of the real estate leasing corporations were handled by E. Ward King, John R. King, and, to a lesser extent, E. William King. E. Ward King was president and director of Mason & Dixon from March 14, 1950, to March 12, 1957, when he became board chairman, and he was treasurer from March 14, 1950, until July 31, 1951. John R. King was elected vice president, assistant treasurer, and director on March 11, 1952, and executive vice president and general manager on March 12, 1957. E. William King was elected treasurer on July 31, 1951, director on March 11, 1952, and president on March 12, 1957. None of these men received a salary from the real estate leasing corporations.

Once Mason & Dixon determined a new terminal was needed, the terminal manager and his sales personnel in the city under considera-

tion would make a study in order to determine the best location. The property would then be acquired by E. Ward King or John R. King on behalf of a particular leasing corporation. Then Mason & Dixon employees would work with Allen N. Dryden (hereinafter referred to as Dryden), an architect, in order to determine plans and specifications. Dryden was engaged and paid by Mason & Dixon. Dryden would then put the construction contract out for public bid. The bid would be accepted by the leasing corporation involved which would also take title. In the normal case, E. Ward King or John R. King would arrange permanent financing for the subsidiary for as large a portion of the construction cost of the terminal as possible which would usually equal about two-thirds of the cost. The permanent loan was secured by a first-mortgage real estate note, the deed to secure the debt, and an assignment of the lease between Mason & Dixon and the subsidiary, which called for monthly rentals adequate to take care of complete amortization of the loan within approximately a 10-year period.

In determining the rental to be paid on a terminal to one of the subsidiaries, E. Ward King, John R. King, and E. William King considered the total cost of the terminal, including the cost of the land, the cost of construction, the cash invested in the building, and a fair return based on the local market as determined in discussions with real estate people and investors in the community. Generally speaking, in most leases the rental was computed to reflect a return of approximately 12 percent per year on the total cost of the terminal.

The real estate leasing corporations received gross rentals and reported taxable income for the years indicated as follows:

| Taxable year | Interstate | | Motorways | | Regal | |
|---|---|---|---|---|---|---|
| | Gross rentals | Taxable income | Gross rentals | Taxable income | Gross rentals | Taxable income |
| 1950 | $1,700.00 | $660.52 | | | | |
| 1951 | 75,350.00 | 33,344.57 | | | | |
| 1952 | 95,400.00 | 43,322.37 | | | | |
| 1953 | 95,025.00 | 32,720.68 | $6,250.00 | $282.65 | | |
| 1954 | 86,400.00 | 31,204.13 | 24,387.50 | None | | |
| 1955 | 86,353.82 | 28,136.87 | 42,700.00 | 3,935.94 | | |
| 1956 | 108,700.00 | 22,359.67 | 53,500.00 | 2,263.64 | $1,727.14 | $959.84 |
| 1957 | 113,338.48 | 33,184.23 | 77,800.00 | 16,436.22 | 7,894.71 | 4,046.79 |
| 1958 | 121,350.00 | 38,767.31 | 77,800.00 | 17,924.75 | 24,850.00 | 5,536.83 |
| 1959 | 119,450.00 | 47,135.19 | 79,338.46 | 14,163.93 | 36,725.00 | 10,502.45 |
| 1960 | 119,100.00 | 49,962.55 | 90,800.00 | 17,491.42 | 36,725.00 | 4,167.99 |
| 1961 | 119,925.00 | 61,642.66 | 90,800.00 | 22,143.48 | 56,700.00 | 6,205.23 |
| 1962 | 147,341.09 | 78,884.19 | 107,098.08 | 22,242.75 | 74,901.93 | 12,342.67 |
| 1963 | 146,158.95 | 71,857.14 | 107,298.97 | 25,822.43 | 87,536.08 | 11,742.81 |
| 1964 | 152,425.49 | | 107,748.53 | | 124,136.76 | |
| 1965 | 151,065.05 | | 107,384.21 | | 131,001.74 | |
| 1966 | 169,746.03 | | 101,626.41 | | 135,105.92 | |

All of the rentals reflected above were paid by Mason & Dixon.

Mason & Dixon, which filed consolidated income tax returns with its subsidiaries for 1957 through 1961, showed operating revenues and taxable income as follows for the years indicated:

| Year | Operating revenue | Taxable income |
|---|---|---|
| 1957 | $16, 572, 572. 72 | $1, 143, 703. 25 |
| 1958 | 17, 655, 592. 94 | 620, 005. 61 |
| 1959 | 20, 511, 589. 94 | 658, 292. 33 |
| 1960 | 20, 574, 423. 94 | 463, 731. 26 |
| 1961 | 22, 459, 681. 87 | (1, 622, 695. 56) |
| 1962 | 24, 504, 435. 56 | 115, 389. 81 |
| 1963 | 24, 488, 800. 65 | 797, 852. 93 |

In 1960 the stockholders of Mason & Dixon entered into negotiations with the Buhner family, who were the controlling stockholders of Silver Fleet Motor Express, Inc. (Delaware), a holding company with four wholly owned subsidiaries, namely, Ardmore Equipment Co., Inc., an equipment leasing corporation; Garland Real Estate & Insurance Co., Inc., and Garland Real Estate & Insurance Agency, Inc., both of which were real estate leasing corporations; and Silver Fleet Motor Express, Inc. (Indiana), a motor common carrier.

Silver Fleet (Indiana) operated in interstate commerce as a motor carrier of general commodities over regular routes extending from Birmingham, Ala., on the south, to Chicago, Ill., on the north, and including all of the principal points in the rich industrial area that lies between them. The Mason & Dixon stockholders entered into negotiations with the Buhner family because they wanted these valuable operating rights from New York to Atlanta. Silver Fleet (Indiana) and Mason & Dixon each had approximately 5,000 miles of authorized routes; and they connected at five points in the south, forming a giant V. Thus the acquisition would approximately double the authorized routes of Mason & Dixon and would get Mason & Dixon into an important freight-producing area not previously served, including Chicago which is probably the biggest freight-producing point in the United States.

Agreement was reached on a plan which involved two contracts as follows:

A. On June 15, 1960, Crown entered into a contract with the controlling stockholders of Silver Fleet (Delaware), the holding company, for the purchase of their stock at a price of $18.75 per share, subject to certain adjustments. The same price would be offered for all outstanding minority interests. The estimated purchase price was $2,060,000.

B. Concurrently therewith on June 15, 1960, Silver Fleet (Delaware) entered into a contract with Mason & Dixon to exchange all of the stock of its subsidiary, Silver Fleet (Indiana), for common stock of Mason & Dixon.

The contract between Mason & Dixon and Silver Fleet (Delaware), required the approval of the ICC. Both contracts were made contingent upon each other and upon the approval of the ICC.

On June 21, 1960, Mason & Dixon filed an application with the ICC

for authority to acquire control of Silver Fleet (Indiana). On July 1, 1960, Mason & Dixon was authorized to assume temporary control of Silver Fleet (Indiana) through management, for compensation of not in excess of $1,000 per month, pending a final determination of its application to acquire control. Such authority to assume temporary control was exercised July 18, 1960.

At the hearing on Mason & Dixon's application, an amendment was submitted, based on a plan of reorganization, by which Crown asked for authority to acquire control of Mason & Dixon and its subsidiaries and of M. & D. Investment Co., Inc., through exchanges of capital stock, and of Silver Fleet (Delaware) through purchase of capital stock for cash. As part of this proposed amendment Crown adopted the position that it should not be subjected, if it acquired control of Mason & Dixon, to the provisions of section 5(3) of the Interstate Commerce Act relating to reports, accounts, and the issuance of securities.

This plan was abandoned when the ICC determined that Crown would be subjected to section 5(3) of the Interstate Commerce Act if the plan were executed.

By letter dated May 1, 1963, addressed to the Commissioner of Internal Revenue, Mason & Dixon requested a ruling on the tax consequences of the proposed acquisition by said corporation of all of the outstanding stock of Silver Fleet (Indiana) in exchange for common voting stock of Mason & Dixon.

On September 13, 1963, the IRS ruled that no gain or loss would be recognized to either Mason & Dixon or Silver Fleet (Indiana) upon the exchange of stock.

At a special meeting of the board of directors of Mason & Dixon held on October 1, 1963, the following resolution was adopted:

WHEREAS, the corporation is in great need of additional facilities at various points, including facilities recently completed or under construction at Kingsport, Cincinnati, Baltimore, and Asheville, none of which has been permanently financed by the owners, and

WHEREAS, the acquisition of Silver Fleet Motor Express, Inc. (Indiana), which has been approved and will be consummated within a short time, will create a need for new and modern terminal facilities at all of their major points, and

WHEREAS, the total needs for such facilities are so great that the real estate subsidiaries of the corporation and those of Silver Fleet Motor Express, Inc. (Delaware) are having difficulty in arranging sufficient financing to fulfill those needs, and

WHEREAS, if all of the affiliated and related non-carrier corporations of this corporation were brought under common ownership, it is believed that their combined financing requirements and financial strength would permit them to deal with the larger lending institutions which are not now open to them as separate, non-affiliated corporations, and

WHEREAS, such a pooling of ownership would require the corporation either to acquire all other such related corporations or dispose of its stock of Interstate Investment Corporation, Motorways Investment Corporation, and The Regal Corporation; and it is feared that the heavy financing by such corporations, if subsidiaries of the corporation, might limit or otherwise conflict with the financing capabilities of the corporation.

NOW, THEREFORE, BE IT RESOLVED THAT it is deemed advisable and to the best interest of this company that a dividend be, and it is hereby, declared on the common stock of this company, payable in the common stock of Interstate Investment Corporation, Motorways Investment Corporation, and The Regal Corporation owned by this company, the payment of the dividend to be made on October 4, 1963, by the transfer and delivery to the stockholders of this company on the basis of the percentage that their stockholdings in this company bear to the total stock this company owns in each of said three corporations, adjusted equitably between said stockholders, if deemed advisable, to the nearest whole share.

By appropriate action of the directors and stockholders of Crown at meetings held on October 1, 1963, resolutions were adopted authorizing and directing the officers:

to acquire common capital stock of the M. & D. Investment Company, Inc., Interstate Corporation, Motorways Investment Corporation and The Regal Corporation, in exchange for the common capital stock of this corporation, the value of the shares of each company to be determined on the basis of the underlying tangible assets as at October 4, 1963, as determined by the officers of this corporation; said exchange, however, to be conditioned upon this corporation acquiring not less than 95% of the outstanding capital stock of each corporation;

Pursuant to these resolutions of the directors and stockholders of the corporations involved, the following action was taken on October 4, 1963:

A. All of the stock of Interstate, Motorways, and Regal was distributed by Mason & Dixon to its common stockholders with respect to their stock in Mason & Dixon. The shares of Mason & Dixon of each stockholder and the subsidiary shares distributed to each are as follows:

| Shareholder | Shares of Mason & Dixon | Subsidiary shares distributed | | |
|---|---|---|---|---|
| | | Interstate | Motorways | Regal |
| E. Ward King | 1,847 | 177.29423 | 184.7 | 147.81924 |
| E. William King | 2,384 | 228.84106 | 238.4 | 190.79647 |
| E. William King, trustee for E. William King, Jr | 400 | 38.39615 | 40.0 | 32.01283 |
| Elizabeth Madison King | 400 | 38.39615 | 40.0 | 32.01283 |
| Mary Armistead King | 245 | 23.51764 | 24.5 | 19.60786 |
| John R. King | 2,384 | 228.84106 | 238.4 | 190.79647 |
| John R. King, trustee for Jennifer S. King | 400 | 38.39615 | 40.0 | 32.01283 |
| John R. King, Jr | 400 | 38.39615 | 40.0 | 32.01283 |
| Margaret K. Norris | 2,304 | 221.16183 | 230.4 | 184.39390 |
| Margaret K. Norris, trustee for Cheryl Ann Norris | 400 | 38.39615 | 40.0 | 32.01283 |
| Laura Charlton Norris | 245 | 23.51764 | 24.5 | 19.60786 |
| Edwin Ward Norris | 100 | 9.59904 | 10.0 | 8.00321 |
| S. T. King | 482 | 46.26736 | 48.2 | 38.57547 |
| L. W. Pendleton | 30 | 3.00000 | 3.0 | 2.00000 |
| King Foundation | 479 | 45.97939 | 47.9 | 38.33537 |
| Total shares | 12,500 | 1200.00000 | 1250.0 | 1000.00000 |
| Par value per share | $10 | $100 | $100 | $100 |

B. Immediately upon receipt of the stock of the three subsidiary corporations, all of the stockholders of Mason & Dixon (except Lloyd W. Pendleton) transferred all of their stock in Interstate, Motorways, and Regal, and the stockholders of M. & D. Investment transferred all of their stock in said corporation, to Crown solely in exchange for voting stock of Crown. As a consequence Crown was in control of all of these corporations immediately after the transfer.

On October 4, 1963, the fair market value per share of the stock of Interstate, Motorways, and Regal was as follows: Interstate, $591.-6667; Motorways, $258; Regal, $164.

After the transactions described above, Interstate, Motorways, and Regal carried on in the same fashion as they had theretofore.

On November 1, 1963, Crown acquired for cash 110,156 of the 110,908 outstanding shares of Silver Fleet Motor Express, Inc. (Delaware), the holding company. Simultaneously with this acquisition, Mason & Dixon acquired from said holding company all of the common stock of Silver Fleet Motor Express, Inc. (Indiana), the motor carrier, solely in exchange for common stock of Mason & Dixon.

The adjusted price which Crown actually paid for the stock of Silver Fleet (Delaware) was $17.18 per share, and the final purchase price of all of the stock was $1,905,399.44. Crown, as required by the Commissioner's regulations, allocated this purchase price among the assets it received, which, of course, included the capital stock of the various Silver Fleet subsidiaries. The allocation was made by appraising the underlying tangible assets of all of the acquired corporations and assigning to the franchises of the motor carrier subsidiary the excess of the purchase price and the liabilities assumed over the fair market value of such underlying tangible assets.

The contract dated June 15, 1960, between Silver Fleet (Delaware) and Mason & Dixon provided that the price which Mason & Dixon would pay for all of the capital stock of Silver Fleet (Indiana) would be $500,000 in cash or, at the option of Mason & Dixon, a number of shares of its own common stock having an equivalent book value. Book value was defined as being the value as reflected by Mason & Dixon's books as of the close of the last accounting period immediately preceding the final closing of the exchange. The exchange was consummated on November 1, 1963, and the last preceding accounting period had ended on October 4, 1963. Mason & Dixon computed the book value of its common stock as reflected by its books as of October 4, 1963, and determined that 1,485 shares would be required to come to the total value of $500,000. Mason & Dixon, therefore, issued 1,485 shares of its common stock to Silver Fleet (Delaware), representing a book value of $500,000.

Following the transactions of October 4, 1963, and November 1, 1963, Crown, acting for itself and its subsidiaries, was able to borrow the following amounts and secure the following lines of credit:

*Long-term credit on real estate*

| | |
|---|---|
| Massachusetts Mutual Life Insurance Co.—May 23, 1964 | [1] $3, 000, 000 |
| Aetna Life Insurance Co.—continuing arrangement for financing new terminals as constructed. Amounts borrowed to date: | |
| July 1, 1966 | [2] 1, 000, 000 |
| Dec. 20, 1967 | 950, 000 |

*Bank credit for construction and other purposes*

| | |
|---|---|
| First National City Bank of New York: | |
| Loan dated Oct. 28, 1963 | [3] 2, 000, 000 |
| Central National Bank of Chicago: | |
| Line of credit extended Dec. 10, 1964 | [4] 1, 000, 000 |
| Increase extended Nov. 26, 1965 | 500, 000 |
| First National Bank of Boston: | |
| Line of credit extended Dec. 8, 1965 | [5] 1, 000, 000 |
| Citizens & Southern National Bank: | |
| Line of credit extended July 24, 1964 | [6] 750, 000 |

[1] The proceeds of this loan were used to repay loans of construction money made by Crown to its subsidiaries. Crown then used part of the payment it received to repay the $2 million loan it had received from First National City Bank of New York, discussed in fn. 2 *infra*. This loan, which was actually composed of six smaller loans to M. & D. Investment, Interstate, and Regal, was fully secured by notes, mortgages, and/or deeds of trust on various terminals, as well as assignments of long-term leases executed by Mason & Dixon. One of the leases assigned to secure $330,000 of the $3 million contained a provision whereby, upon default of Regal, Mason & Dixon agreed to make payment.

[2] These loans were secured by mortgages as well as assignment of Mason & Dixon leases.

[3] This loan was procured by Crown to finance the purchase of the Silver Fleet (Delaware) stock from the stockholders. E. Ward King, E. William King, and John R. King were required to give personal guarantees for this loan.

[4] E. Ward King, John R. King, and E. William King were required to personally guarantee this loan.

[5] Personal guarantees were initially required by this lender; however, this requirement was subsequently withdrawn.

[6] Again personal guarantees were required at inception, but released during 1968.

Prior to October 4, 1963, the three real estate leasing corporations, as well as M. & D. Investment which leased the Kingsport terminal to Mason & Dixon, had been able to procure substantial loans for construction money and long-term financing. These loans were secured by mortgages on the property under construction and by assignment of long-term leases from Mason & Dixon.

In the acquisition, construction, and financing of new terminals after October 4, 1963, substantially the same procedure was followed as described above with respect to the terminals leased by Mason & Dixon from Interstate, Motorways, and Regal prior to such date except Mason & Dixon no longer paid the architect's fees. Such fees were paid by the leasing company and capitalized as a part of the cost of the building.

In 1964 Crown's board of directors decided to dissolve Silver Fleet

Motor Express, Inc. (Delaware), and adopted a plan of liquidation. In accord with such plan Silver Fleet ceased doing business on June 12, 1964, and all of its assets and liabilities were distributed immediately to Crown in complete redemption and cancellation of its stock in the holding company. The liquidation was reported by Crown on its Federal income tax return for 1964 as a tax-free liquidation under section 332 of the Code. On such return, Crown reported receipt of the following assets distributed in liquidation of Silver Fleet (Delaware):

| Asset | Fair market value |
|---|---|
| 200 shares Garland Real Estate & Insurance Co. | $454,130.53 |
| 10 shares Garland Real Estate & Insurance Agency, Inc. | 575,254.83 |
| 1,000 shares Ardmore Equipment Co., Inc. | 426,277.79 |
| 1,485 shares Mason & Dixon (common) | 499,821.30 |
| Total | 1,955,484.45 |

On its Federal income tax return for 1964, Interstate listed as an asset on its balance sheet under "other investments" common stock of Mason & Dixon in the amount of 1,967 shares purchased at a cost of $669,821.30. Interstate purchased 1,485 shares of the Mason & Dixon stock from Crown and 482 shares from S. T. King. E. Ward King negotiated the purchase of the Mason & Dixon stock from S. T. King along with the purchase of S. T. King's shares of stock in Crown. After E. Ward and S. T. King had reached an agreement on the price of the stock in both corporations, Interstate purchased the Mason & Dixon stock and E. Ward King personally bought the Crown stock from S. T. King.

In the summer of 1969, L. W. Pendleton sold all of the common and preferred stock which he owned in Mason & Dixon and all of the stock he owned in Interstate, Motorways, and Regal which had been distributed to him on October 4, 1963.

For each of the years involved, the petitioners in each case reported their income for Federal income tax purposes on the cash basis. For each of the years involved, Mason & Dixon and its subsidiaries, Crown, M. & D. Investment, and the subsidiaries of Crown, reported their income for Federal income tax purposes on the accrual basis.

On their 1963 Federal income tax returns, the petitioners in each of the cases involved here reported no gain or loss on the distribution of the stock by Mason & Dixon in Interstate, Motorways, and Regal on October 4, 1963, on the ground that the distribution fell within the provisions of section 355 of the Code.

The respondent in his notices of deficiency to all of the petitioners in this case stated his determination that the distribution of the stock of Interstate, Motorways, and Regal constituted a taxable dividend under

sections 301 and 316. The respondent treated the full fair market value of the stock received by each petitioner as dividend.[4]

OPINION

The sole issue for decision is whether the distribution by Mason & Dixon to its shareholders of all the stock of its three wholly owned subsidiaries, Interstate, Motorways, and Regal, on October 4, 1963, qualifies as a nontaxable distribution under section 355.[5]

The specific requirements of section 355 deemed pertinent by the parties are that (1) "the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation [Mason & Dixon] or the controlled corporation [the subsidiaries]," and (2) the parent corporation and its subsidiaries mut be engaged immediately after the distribution and for 5 years prior to the distribution "in the active conduct of a trade or business." The respondent has not taken issue with the petitioners' assertion of compliance with the other elements of section 355. In our consideration

---

[4] It does not appear that the petitioners contest that Mason & Dixon had sufficient earnings and profits to render the entire distribution a dividend if sec. 355 is held inapplicable.

[5] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(a) EFFECT ON DISTRIBUTEES.—

(1) GENERAL RULE.—If—

(A) a corporation (referred to in this section as the "distributing corporation")—

(i) distributes to a shareholder, with respect to its stock, or

\* \* \* \* \* \* \*

(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both \* \* \*

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

\* \* \* \* \* \* \*

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

\* \* \* \* \* \* \*

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

\* \* \* \* \* \* \*

(2) DEFINITION.—For the purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

of the positions of the parties we will first turn our attention to the second of the above conditions.

The respondent has raised no question concerning the 5-year active-business history of Mason & Dixon so that our inquiry may be further narrowed to the question of whether Interstate, Motorways, and Regal were engaged in the active conduct of a business for the 5-year period ending on October 4, 1963, the date of distribution, and immediately following such distribution.

"Active conduct of a trade or business" is undefined by any section of the Internal Revenue Code and, therefore, in order to arrive at a useful explanation of the phrase it is desirable to refer to the congressional purpose behind the enactment of section 355. See *Joseph V. Rafferty*, 55 T.C. 490 (1970).[6] Detailed analyses of such purpose, however, have been undertaken on many occasions in the past, e.g., *Joseph V. Rafferty*, *supra* at 498, *Isabel A. Elliott*, 32 T.C. 283, 290 (1959), so that little is to be served by a lengthy reiteration. It suffices to say that the *raison d'être* of the active conduct of trade or business requirement is to prevent the tax-free segregation of passive investment-type assets into an inactive corporate entity; thus enabling future sale at capital gains rates of the inactive portion of the distributing corporation's business. The inactive assets may well represent the accumulated earnings and profits of the continuing active business.[7] *Bonsall* v. *Commissioner*, 317 F. 2d 61, 65 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court; *Edmund P. Coady*, 33 T.C. 771, 777 (1960), affirmed per curiam 289 F. 2d 490 (C.A. 6, 1961).

In determining the specific meaning of trade or business for purposes of section 355 we have, in the past, deemed it necessary to eschew reference to cases decided under other sections of the Code, *Isabel A. Elliott*, *supra* at 289–290; some guidance, however, is offered in this regard by a portion of the respondent's regulations. Section 1.355–1(c) provides, in part:

for purposes of section 355, a trade or business consists of a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the *activities included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and the payment of expenses.* * * * [Emphasis supplied.]

We have expressed our approval of this portion of the regulations on several past occasions, e.g., *Andrew M. Spheeris*, 54 T.C. 1353, 1362 (1970); *Patricia W. Burke*, 42 T.C. 1021, 1028 (1964).

---

[6] See also Whitman, "Draining the Serbonian Bog: A New Approach to Corporate Separations Under the 1954 Code," 81 Harv. L. Rev. 1194, 1211.

[7] As we pointed out in *Joseph V. Rafferty*, 55 T.C. 490 (1970), there is an area of conjunction between the "device test" and the "active conduct of a trade or business test."

Turning now to the facts of this case we note that, during the 5-year period ending on October 4, 1963, Mason & Dixon, the distributing corporation, actively engaged in the business of a common carrier of freight in interstate commerce. During this entire period Mason & Dixon held all of the stock of three of its subsidiaries, Interstate, Motorways, and Regal, the controlled corporations. At all times herein relevant the controlled corporations leased motor carrier terminals to Mason & Dixon on a net lease basis; i.e., all expenses, such as maintenance, repairs, taxes, and insurance, were paid by the lessee. The rentals charged were computed on the base of approximately 1 percent of the cost of the particular terminal per month. Parenthetically, we might mention that nothing in the record indicated that these rentals were other than customary within the industry. One of the terminals in question had been transferred by Mason & Dixon to Interstate, but the remainder were constructed by the particular leasing company involved.[8]

On October 4, 1963, Mason & Dixon distributed the stock of its three subsidiaries to its shareholders. The shareholders then, with minor exceptions, exchanged these shares for stock in Crown, a corporation owned by shareholders of Mason & Dixon. The shareholders of M. & D. Investment, which owned Mason & Dixon's terminal at Kingsport, at this time also transferred their stock to Crown for common stock. The net result of these transfers was that Mason & Dixon, as well as its subsidiary *operating* companies, were in one group of corporations and the *real estate holding* corporations were in another. Both groups were owned by the same shareholders. We do not question that these transactions were entered into for valid business reasons as described in our Findings of Fact.

Nevertheless, we must evaluate the activities performed by three of these real estate holding corporations, Interstate, Motorways, and Regal, during the 5-year period prior to October 4, 1963. If these activities did not constitute the active conduct of a trade or business as the respondent contends, we must sustain his determination as being required by the rigid standards of the statute.

It is our holding that Interstate, Motorways, and Regal were not engaged in the active conduct of a trade or business. During the critical 5-year period the books and records and other general accounting services were kept and performed by James Little, who, it appears, was their only salaried employee. Little was, during this period, also an employee of Mason & Dixon. It was at Mason & Dixon's corporate

---

[8] We have for the sake of convenience used the phrase "constructed by the particular leasing company involved ;" further discussion of this important point appears *infra.*

headquarters that he had his office and it was at Mason & Dixon's that the books and records of the subsidiaries were physically located. Beginning in June of 1961, and from then on, for all the record indicates, the real estate corporations had no employees whatsoever. We do know that after that date all of Little's duties were performed by employees of Mason & Dixon, which received a management fee for these services. Maintenance and repair of the terminals were performed by Mason & Dixon employees or were contracted for by Mason & Dixon. The petitioners offered numerous explanations for the performance by Mason & Dixon of services pertinent to the terminals. Without questioning the accuracy of these explanations the fact remains that there is no evidence to show that the corporations ever had more than one employee, and objectively we find it quite difficult to perceive the *active* conduct of a trade or business when no *activities* are being performed by the corporations in question. In conjunction with the paucity of real estate leasing company employees we also found the lack of office, address, and telephone antithetical to the active conduct of a trade or business.

Another important factor in our conclusion that Interstate, Motorways, and Regal were not in the active conduct of a trade or business is the net lease basis upon which properties were leased to Mason & Dixon. Disregarding momentarily the costs of construction, the receipt of rentals in this fashion represents pure passive income without concomitant expenditure of money or effort on the part of the lessor and stands in diametric opposition to the concept of active conduct. *Joseph V. Rafferty, supra* at 499. While no doubt this was the most advantageous method of doing business from the leasing corporations' points of view, such a conclusion cannot be equated with a further conclusion that the corporations were engaged in the active conduct of a trade or business.

Of prime importance, too, is the fact that none of the real estate leasing corporations received rentals from tenants other than Mason & Dixon. In fact the petitioners have conceded that, at least during the 5-year period under consideration, no other tenants were even sought. The petitioners argue that it was always their intention to do so at the propitious time; however, proof sufficient to buttress this contention was not offered at trial. Under these circumstances the objective evidence speaks for itself.

Had no activities of the real estate leasing corporations, other than those discussed above, been present, our prior decisions concerning

real estate leasing from subsidiary to parent would have been dispositive. *Joseph V. Rafferty, supra; Bonsall* v. *Commissioner, supra; Theodore E. Appleby,* 35 T.C. 755 (1961), affirmed per curiam 296 F. 2d 925 (C.A. 3, 1962); and *Isabel A. Elliott, supra.*

As we stated in *Isabel A. Elliott, supra* at 290,

We do not think a mere passive receipt of income from the use of property which is used in the principal trade or business and which is only incidental to, or an incidental use of a part of property used primarily in, the principal business would constitute *the active conduct of a trade or business* within the meaning of section 355(b) of the Code, *whether or not* such use of property *might constitute a trade or business* within the meaning of other sections of the Code. [Emphasis supplied.]

In the instant case, however, the petitioners contend that in addition to renting terminals to the parent corporation the real estate leasing corporations acquired property, arranged financing, and constructed the terminals. After having carefully considered the petitioners' arguments, it is our conclusion that Interstate, Motorways, and Regal performed these functions in name only.

As we stated in detail in our Findings of Fact, Mason & Dixon would determine when a new facility was needed. Mason & Dixon employees would then determine the proper location for a new terminal. E. Ward or John R. King, officers, shareholders, and directors of Mason & Dixon, would then acquire property for the leasing corporation involved. These men were, to be sure, officers of the real estate leasing corporations, but were not compensated for their services. Mason & Dixon employees would then work with an architect, hired and paid by Mason & Dixon, in drawing plans. The architect would put the construction contract up for bid. Once a bid was accepted the leasing company would execute contracts and then take title to the terminal. The financing of terminals was handled by E. Ward or John R. King and, as part of the security required, net leases between Mason & Dixon and the subsidiary involved were assigned. Finally, rentals were fixed by E. Ward, John R., and E. William King, all Mason & Dixon officers.

From the foregoing synopsis it appears beyond question that the acquisition and construction of terminals was initiated and brought to conclusion by Mason & Dixon employees; financing was arranged by these Mason & Dixon employees and secured, at least in part, by Mason & Dixon's obligation to pay rent. On brief the petitioners urge us not to disregard the sanctity of the corporate entity, but, on facts such as those presented here, the dependence of the subsidiary cor-

porations serves to underline the petitioners' failure to show the active conduct of a business.[9]

On brief the petitioners attempt to distinguish *Elliott*, *Appleby*, and *Bonsall*, on the basis that distributing corporations created the income-producing properties, whereas, in the case at bar Interstate, Motorways, and Regal created the properties. We do not find this reasoning persuasive. In the instant case, as we stated above, Mason & Dixon created the properties to a great extent and further, the assets of the subsidiary corporations represent earnings of their parent. As the petitioners point out Mason & Dixon contributed substantial amounts to the initial capitalization of each corporation. And perhaps more importantly the terminals were built with the rentals that Mason & Dixon paid.

In addition to several of the opinions cited above, the petitioners, on brief, rely on three main categories of decided cases for the propositions that the rental of real estate may constitute a trade or business and that the rental of real estate by a subsidiary solely to its parent may constitute the active conduct of a trade or business. The three categories of cases are as follows: (1) Cases supporting the general proposition that renting real estate is a trade or business; e.g., *Anders I. Lagreide*, 23 T.C. 508 (1954); *Leland Hazard*, 7 T.C. 372 (1946); and *John D. Fackler*, 45 B.T.A. 708 (1941), affd. 133 F. 2d 509 (C.A. 6, 1943); (2) cases decided under section 112(b)(11) of the Internal Revenue Code of 1939; and (3) cases decided under section 355.

Concerning the first category, as stated above, in *Isabel A. Elliott*, *supra* at 289–290, we said that section 355(b) is concerned with the *active* conduct of a trade or business. Accordingly, cases which are decided under sections of the Code not containing the qualification "active" are not authority upon the question of what constitutes the active conduct of a trade or business. Inferentially petitioner would have us give no viability to that qualification.

In their second category the petitioners rely upon *Bondy* v. *Commissioner*, 269 F. 2d 463 (C.A. 4, 1959), reversing 30 T.C. 1037 (1958); *Wilkins* v. *United States*, 188 F Supp. 91 (S.D. Ill. 1960); *Parshelsky's Estate* v. *Commissioner*, 303 F. 2d 14 (C.A. 2, 1962), reversing 34 T.C. 946 (1960); and *Murdock* v. *United States*, an unreported case (W.D. Tenn. 1957, 52 A.F.T.R. 1626, 57–2 U.S.T.C. par. 9959), affirmed per curiam 263 F. 2d 146 (C.A. 6, 1959). None of these cases

---

[9] If this case concerned the horizontal spin-off of terminals which had been owned by Mason & Dixon as was the situation in *Theodore F. Appleby*, 35 T.C. 755 (1961), affirmed per curiam 296 F. 2d 925 (C.A. 3, 1962); see also *Isabel A. Elliott*, 32 T.C. 283 (1959) (wherein the preincorporation history of the subsidiary was considered), the question of corporate independence would not have arisen. The fact that real estate is operated in a subsidiary should not affect the determination of whether there has been the active conduct of a business.

are germane to the issue at bar. In *Bondy*, *Wilkins*, and *Parshelsky*, the question of active conduct of a trade or business was resolved by stipulation or concession of the respondent, thus effectively removing consideration of the issue from the cases. In *Murdock* v. *United States*, *supra*, the District Court stated in its Findings of Fact at paragraph XXIV: "The business of Apex Realty Company consisted solely of acquiring, improving and leasing real estate." [10] The court did not, however, discuss the concept of "active conduct of a trade or business" and so the opinion is of limited usefulness here.

The final category of cases cited by the petitioners contains *Commissioner* v. *Morris Trust*, 367 F. 2d 794 (C.A. 4, 1966), affirming 42 T.C. 779 (1964); *Edmund P. Coady, supra; H. Grady Lester, Jr.*, 40 T.C. 947 (1963); and *Marne S. Wilson*, 42 T.C. 914 (1964), revd. 353 F. 2d 184 (C.A. 9, 1965). We find none of these cases relevant to the issue under consideration.

In *Morris*, *Lester*, and *Wilson*, the controlled corporations received substantial income from sources other than the distributing corporations, situations which were most unlike the one here. In addition, in *Mary Archer W. Morris Trust*, 42 T.C. 779, 791 (1964), affd. 367 F. 2d 794 (C.A. 4, 1966), the respondent's primary contention concerning the active-conduct requirement was that since the distributing corporation was consolidated with another corporation and had ceased to operate under its own charter at the date of distribution it could not be actively engaged in a business immediately after the distribution. The question was not whether a business was in fact actively conducted but rather whether it was being conducted by the distributing corporation.

In *Edmund P. Coady, supra* at 772, 773, the question of whether a business was in fact actively conducted was stipulated. The question was, rather, whether two businesses were necessary in order that a successful vertical splitup be accomplished.

In view of our holding that Interstate, Motorways, and Regal were not engaged in the active conduct of a trade or business during the 5-year period prior to October 4, 1963, it is unnecessary for us to determine whether these corporations were engaged in the active conduct of a trade or business immediately after the distribution under section 355(b)(1)(A). Nor is it necessary for us to determine whether the transaction "was used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation[s]" under section 355(a)(1)(B).

Accordingly,

*Decisions will be entered for the respondent.*

[10] The District Court states at 52 A.F.T.R. 1629 that it amended its Findings of Fact to include the above quotation. The C.C.H. publication does not contain said amendment.