JOSEPH V. RAFFERTY AND MARGARET M. RAFFERTY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2536–69.    Filed December 14, 1970.

*Robert J. McDonough*, for the petitioners.
*Robert B. Dugan*, for the respondent.

DAWSON, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for the year 1965 in the amount of $93,119.51. The only issue for decision is whether the distribution of 4,430 shares of stock of Teragram Realty Co., Inc., to petitioners by Rafferty Brown Steel Co., Inc., in 1965 constituted a distribution on which no gain or loss is recognized under the provisions of section 355, I.R.C. 1954.[1]

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

Joseph V. Rafferty and Margaret M. Rafferty (herein called petitioners) are husband and wife who resided in East Longmeadow, Mass., at the time the petition was filed in this case. Petitioners filed their joint Federal income tax return for the year 1965 with the district director of internal revenue, Boston, Mass.

At all times pertinent hereto and to the present, petitioners have jointly owned all of the outstanding shares of stock of Rafferty Brown Steel Co., Inc. (herein called RBS), a Massachusetts corporation engaged in the distribution and processing of cold rolled sheet and strip steel. In May 1960 Teragram Realty Co., Inc. (herein called Teragram), was organized as a Massachusetts corporation and in June 1960, RBS transferred the real property owned by it in East Longmeadow, Mass., where it conducted its steel business, to Teragram in exchange for 4,430 shares of Teragram stock which constituted all of the outstanding stock of Teragram. On June 30, 1960, Teragram then leased back the East Longmeadow realty to RBS for 10 years.

The lease agreement entered into between RBS and Teragram provided, in part, as follows:

WITNESSETH, that in consideration of the Covenants herein contained, on the part of the said RAFFERTY-BROWN STEEL CO., INC., and its representatives, to be kept and performed by it the said TERAGRAM REALTY CO., INC., doth hereby lease unto the said RAFFERTY-BROWN STEEL CO., INC., the entire real estate holdings of the lessor located on Shaker Road in East Longmeadow, Massachusetts. The said real estate holdings shall include a Shepard-Niles ten (10) ton Overhead Bridge Crane—1957 Model which is agreed to be part of the said realty.

To HAVE AND TO HOLD the said premises hereby leased unto the said RAFFERTY-BROWN STEEL CO., INC., and its representatives from the First day of July, 1960 during the full term of ten years thence next ensuing:

YIELDING AND PAYING (except only in case of fire or other casualties hereinafter mentioned) as rent, the sum of $420,000.00 payable in equal monthly instalments of $35,000.00 with the first instalment to be payable on July 1, 1960, the succeeding instalments to be paid on the first of each succeeding month thereafter for the balance of the term, and for such further time as the said lessee, or any other person or persons claiming under it shall hold the said premises or any part thereof: And the said lessee for itself and its representatives hereby covenants and promises with and to the said TERAGRAM REALTY CO., INC., its representatives and assigns, that it will, during the said term, and for such further time as the said Lessee or any other person or persons claiming under it, shall hold the said premises, or any part thereof, pay unto the Lessor or its assigns, the said monthly rent, upon the days hereinbefore appointed for the payment thereof (except only in case of fire or other casualty as hereinafter mentioned), and also all the taxes and assessments whatsoever, whether in the nature of

taxes now in being or not, which may be payable for, or in respect of the said premises, or any part thereof during said term, and for such further time as the said Lessee or any person or persons claiming under it shall hold the said premises or any part thereof: AND also will keep all and singular the said premises in such repair as the same are in at the commencement of said term, or may be put in by the said Lessor or its representatives during the continuance thereof; reasonable use and wear, and damage by accidental fire or other inevitable accidents only excepted; and also it will pay the taxes levied for the use of the water furnished by the Town of East Longmeadow during the continuance of this Lease.

PROVIDED ALWAYS, that in case the premises or any part thereof shall, during said term, be destroyed or damaged by fire or other unavoidable casualty, so that the same shall be thereby rendered unfit for use and habitation, then, and in such case the rent hereinbefore reserved, or a just and proportionate part thereof, according to the nature and extent of the injury sustained, shall be suspended or abated, until the said premises shall have been put in proper condition for use and habitation and in case of such destruction or damage, or a like destruction or damage by any taking or appropriation by public authority for public uses, then the Lessor, its heirs or assigns, may terminate this lease.

And it is also hereby understood and expressly agreed by the parties to this Indenture, that all merchandise, furniture, and property of any kind, which may be on the premises during the continuance of this lease, is to be at the sole risk and hazard of the Lessee and that if the whole or any part thereof shall be destroyed or damaged by fire, water or otherwise, or by the use or abuse of the Town water, or by the leakage or bursting of water pipes, or in any other way or manner, no part of said loss or damage is to be charged to or be borne by the Lessor in any case whatever. And the Lessee further promises that it will keep whole and in good condition, all the window and other glass on the premises, and also the pipes, faucets, and water fixtures, and that it will leave the same whole and in good condition at the termination of this lease.

In 1962 Rafferty Brown Steel Co., Inc., of Connecticut (herein called RBS Connecticut) was organized by the petitioners who have jointly owned all of its stock since its formation. RBS Connecticut was organized to acquire the assets of Hawkridge Bros. which operated a general steel products warehouse at Waterbury, Conn. After acquiring the assets of Hawkridge Bros., RBS Connecticut leased for its operations the real property owned by Hawkridge Bros. in Waterbury for a 3-year period.

In 1965 Teragram acquired a tract of unimproved real property in Waterbury. The approximate cost of the property and the preparation of this land for construction of a plant was $35,000. Teragram contracted for the construction of a plant on such site, arranged mortgage financing using both the Waterbury and East Longmeadow properties as security, and became the sole party obligated on the mortgage. On June 25, 1965, Teragram leased the facility in Waterbury to RBS Connecticut for a term of 14 years.

Teragram has continued to own and lease the realty at Waterbury and East Longmeadow to RBS Connecticut and RBS which com-

panies have continued to operate their businesses at the respective locations through the present time. These properties are suitable for use by other companies in other types of businesses than those of RBS and RBS Connecticut.

Since its formation in 1960, Teragram's chief executive officer has been Joseph V. Rafferty (herein referred to individually as petitioner) who has been and currently is the company's president and treasurer. Since its formation, Teragram has maintained separate books and records of account and filed separate State and Federal tax returns.

During the years in issue Teragram has derived all of its income from rent paid by RBS or RBS Connecticut. For the taxable years ended March 31, 1961, through March 31, 1965, Teragram received rental income from RBS in the following amounts:

| TYE Mar. 31— | Rental income |
|---|---|
| 1961 | [1]$31, 500 |
| 1962 | 42, 000 |
| 1963 | 42, 000 |
| 1964 | 42, 960 |
| 1965 | 42, 960 |

[1] Nine-month period.

During this same period Teragram claimed recurring annual deductions on its Federal income tax returns for State and local taxes, interest, depreciation, and insurance. No deductions for wages or salaries during this period were claimed on such tax returns.

The earned surplus account of Teragram increased from $4,119.05 as of March 31, 1961, to $46,743.35 as of March 31, 1966, while the earned surplus account of RBS increased from $331,117.97 as of June 30, 1959, to $535,395.77 as of June 30, 1965. In August 1965, RBS distributed the capital stock of Teragram, constituting 4,430 shares, to petitioners. Other than this stock distribution in 1965, neither RBS nor Teragram has paid any dividends during the years in question.

Prior to the formation of Teragram, petitioner discussed with his accountant his desire to provide for the orderly disposition of RBS. However, he indicated that he wished to exclude his daughters or future sons-in-law from the steel business, while providing them with something that produced a steady income, as opposed to the violently fluctuating income of the steel business. After Teragram was brought into being and during the period between June 1960 and August 1965, petitioner inquired into and discussed with his accountant the possibility of having RBS distribute the Teragram stock. The distribution of this stock was deemed desirable so that gifts of the stock could be made to the daughters of petitioners.

The children of petitioners and the dates of birth of each of them are as follows:

| Name | Date of birth | Name | Date of birth |
|---|---|---|---|
| Mary | Sept. 12, 1942 | Michael | Nov. 11, 1952 |
| Joseph, Jr. | July 14, 1944 | Thomas | Nov. 10, 1954 |
| Kevin | Apr. 22, 1946 | Louise | Jan. 13, 1957 |
| Martha | Oct. 10, 1947 | John | Jan. 13, 1957 |
| Anne | May 20, 1951 | | |

Petitioner was advised by his accountant that the distribution of Teragram stock should not be effected until 5 years after Teragram was created; that the distribution, in the accountant's opinion, would not be a device for the distribution of earnings and profits; and, in his opinion, the requirements of section 355 of the Internal Revenue Code regarding the active business provisions had been met. Petitioner has relied solely on his accountant for tax advice from 1948 through 1966 and was counseled by his accountant prior to 1960 that it would be advisable to have a separate real estate corporation formed. Petitioner has never entered into negotiations or taken any other steps to sell the stock of RBS, RBS Connecticut, or Teragram.

### ULITIMATE FINDINGS

1. The primary purpose in forming Teragram and having all of its stock ultimately distributed to petitioners was to facilitate the distribution of assets among the Rafferty children in accordance with the estate plan of petitioner Joseph V. Rafferty.

2. Petitioners have failed to establish that Teragram was engaged in the active conduct of a trade or business throughout the 5-year period preceding the distribution of its stock.

### OPINION

In August 1965 all of the issued and outstanding stock of Teragram was distributed to petitioners by RBS. Petitioner treated this distribution as a nontaxable transaction under section 355.[2] Respondent takes

---

[2] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

  (a) EFFECT ON DISTRIBUTEES.—

    (1) GENERAL RULE.—If—

      (A) a corporation (referred to in this section as the "distributing corporation")—

        (i) distributes to a shareholder, with respect to its stock, or

        (ii) distributes to a security holder, in exchange for its securities,

    solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

      (B) the transaction was not used principally as a device for the distribution of

the position that (a) the distribution of stock to petitioners was used principally as a device for the distribution of earnings and profits of RBS or Teragram or both; (b) Teragram was not engaged in the active conduct of a trade or business immediately after the distribution or for the 5-year period prior to the distribution; and (c) the distribution of Teragram stock to petitioners constitutes a taxable dividend.

In urging that petitioners have failed to meet the "non-device" requirement of section 355(a)(1)(B), respondent argues that petitioners have not justified the incorporation of Teragram and the distribution

the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device).

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

\*       \*       \*       \*       \*       \*       \*

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business.

(2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

of Teragram stock to themselves with a valid *corporate* business purpose. Respondent, it would appear, takes a rather myopic view of the transaction in question. The facts unequivocally show that petitioner, through the incorporation of Teragram and the subsequent distribution of its stock by RBS, was seeking to insure the continued existence and success of RBS by precluding any daughters or future sons-in-law from participating in the management of RBS. By making inter vivos or testamentary gifts of the Teragram stock, petitioner believed he would eliminate possible frictions which could arise between his sons, whom he envisioned as his successors in the management of RBS, and his daughters or future sons-in-law whom he envisioned as taking only a passive role in the management of RBS, if they should ever acquire an equity interest in that corporation. These reasons, rather than amounting to naked, personal reasons of the petitioners, as respondent contends, are very much intertwined with the most fundamental of business purposes of the corporation, that of continuity of the corporate enterprise and retention of successful and seasoned management personnel and policies. To hold that the implementation of a plan to avoid possible interfamily squabbling or conflict over management of a closely held corporation constitutes a shareholder, non-business related reason seems to be completely at odds with the realities of the situation.

Respondent asserts that the potential for interfamily conflict is as great, if not greater, as a result of the adoption of the plan to make the daughters the holders of only the property at which RBS conducts its business, rather than an interest in RBS itself. We think that as a result of this planned distribution a mutuality of purpose among all members of the family is achieved regarding the continued prosperous operation of RBS. The Rafferty family members active in the management of RBS are free to pursue corporate policies which may include expansion and reinvestment of corporate profits into the steel business while the other family members, who would be inactive in the management of RBS in any event, are provided with a separate corporate entity whose operation they are free to guide either in the direction of further real estate investment or high cash dividend distributions.

Thus, it is our opinion that not only does there exist a valid nontax reason for the separation of RBS and Teragram but also for the direct ownership of both by petitioners. With respect to whose nontax reason justifies such a conclusion, it is clear in this case that to distinguish between "corporate purpose" and "shareholder purpose" would be unrealistic and impractical, *Lewis* v. *Commissioner*, 176 F.2d 646, 650 (C.A. 1, 1949), affirming 10 T.C. 1080 (1948), since the whole transaction was ostensibly devised to insure the continuity of RBS without

subjecting it to conflict over its management by the various members of the Rafferty family. However, we hasten to point out that in reaching this conclusion we are by no means adopting the broader rule laid down in *Estate of Parshelsky* v. *Commissioner*, 303 F.2d 14, 19 (C.A. 2, 1962), where it was stated:

> Furthermore, since most spin-offs, including the one involved in this case, concern closely-held corporations, it is not only difficult but often purely formalistic to distinguish between corporate and personal benefit.[13] The separate legal entity of corporations cannot obscure the fact that they are operated by their shareholders in the manner most likely to benefit themselves. [Citations omitted.] The benefits to the corporation and to the shareholders are virtually indistinguishable. Consequently, the courts have uniformly held transactions such as reallocations of ownership interests between different groups of shareholders to be tax-free reorganizations. [Citations omitted. Footnote omitted.]

To the contrary, we think it is readily apparent that there are certain instances where a distinction between a corporate purpose and a shareholder purpose must be recognized, i.e., where a distribution is effected solely for the purpose of enabling a shareholder to "milk" the parent corporation; where a distribution is effected for the purpose of meeting the personal obligations of the shareholders of the parent corporation; and where a distribution is effected solely for the purpose of reducing accumulated earnings and profits of the parent corporation which have been permitted to accumulate beyond its reasonable needs. These examples, which are illustrative only and are by no means an exhaustive compilation of shareholder reasons incompatible with the "business purpose" requirements of section 355, are mentioned merely to underscore the fact that there are situations where a shareholder purpose for a corporate separation will not meet the "business purpose" requirements of the statute. We deem respondent's arguments based on *Gregory* v. *Helvering*, 293 U.S. 465 (1935), inapposite to the factual situation of the instant case and point out that the distribution here in question was indeed effected for cogent reasons related to the operation of RBS.

Respondent next argues that under section 355(b) and section 1.355-1(c), Income Tax Regs., both RBS and Teragram must have been engaged in the active conduct of a trade or business throughout the 5-year period preceding the distribution and immediately following such distribution. Petitioners contend that both RBS and Teragram meet these requirements. They stress that since 1960 Teragram has rented improved multipurpose real estate, maintained separate financial records, and filed its own Federal and State income and excise tax returns. It also, in 1965, arranged for the construction of a building and related facilities at Waterbury, Conn., which it financed through a mortgage on which it alone became liable. As a further indication of

its engagement in the active conduct of a trade or business, petitioners assert that had RBS ceased to occupy Teragram's rental property, other tenants could have been easily found or the properties could have been easily sold by Teragram.

In attempting to discern precisely what constitutes the active conduct of a trade or business under section 355 and whether Teragram meets these requirements, we find helpful the Senate Finance Committee's report of changes made by it to the Revenue Act of 1954 as originally introduced in the House of Representatives (H.R. 8300, 83d Cong., 2d Sess.). In explaining its revision the Senate Finance Committee stated:

> Present law contemplates that a tax-free separation shall involve only the separation of assets attributable to the carrying on of an active business. Under the House bill, it is immaterial whether the assets are those used in an active business but if investment assets, for example, are separated into a new corporation, any amount received in respect of such an inactive corporation, whether by a distribution from it or by a sale of its stock, would be treated as ordinary income for a period of 10 years from the date of its creation. *Your committee returns to existing law in not permitting the tax free separation of an existing corporation into active and inactive entities.* It is not believed that the business need for this kind of transaction is sufficiently great to permit a person in a position to afford a 10-year delay in receiving income to do so at capital gain rather than dividend rates. *Your committee requires that both the business retained by the distributing company and the business of the corporation the stock of which is distributed must have been actively conducted for the 5 years preceding the distribution, a safeguard against avoidance not contained in existing law.* [S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 50–51 (1954). Emphasis added.]

Hence, the mere division of the corporate entity into two corporations and the subsequent distribution of the stock of one of the corporations after each has been properly aged over 5 years must be deemed insufficient to meet the requirements of section 355(b). The corporation spun off, in addition to having been seasoned for 5 years, must have been engaged in the active conduct of a trade or business during such period. See sec. 1.355-1(c),[3] Income Tax Regs., elaborating on

---

[3] Sec. 1.355-1   Distribution of stock and securities of controlled corporation.

(c) *Active business.* Section 355 is not applicable unless the controlled corporation and the distributing corporation are each engaged in the active conduct of a trade or business. For specific rules in this connection see section 355(b) (1) and (2). Without regard to such rules, for purposes of section 355, a trade or business consists of a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the activities included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and the payment of expenses. It does not include—

(1) The holding for investment purposes of stock, securities, land or other property, including casual sales thereof (whether or not the proceeds of such sales are reinvested).

(2) The ownership and operation of land or buildings all or substantially all of which are used and occupied by the owner in the operation of a trade or business, or

(3) A group of activities which, while a part of a business operated for profit, are not themselves independently producing income even though such activities would produce income with the addition of other activities or with large increases in activities previously incidental or insubstantial.

this point; see also Massee, "Section 355 : Disposal of Unwanted Assets in Connection with a Reorganization," 22 Tax L. Rev. 439, 459.

In the instant case, between 1960 and approximately January 1965, Teragram's sole activity was the leasing of the East Longmeadow property to RBS, its parent company. Under the terms of the lease between RBS and Teregram, RBS was responsible for all maintenance and repair work required by the property. Teragram held title to the property and paid various taxes and insurance premiums due with respect to the property. Petitioners, upon whom the burden of proof rests in this case, have shown no further activities on the part of Teragram during such period. Respondent points out, on the other hand, that for this same period Teragram's sole source of income was rent paid by RBS, its parent company; that Teragram apparently had no employees during this period; and that Teragram did not claim any deductions for compensation paid to its president and treasurer, Joseph V. Rafferty, for any services rendered during such period. In view of these facts we conclude that Teragram was not engaged in the active conduct of a trade or business for the 5-year period preceding the distribution of its stock to petitioners.[4] See *Henry H. Bonsall, Jr.*, 317 F. 2d 61 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court; *Theodore F. Appleby*, 35 T.C. 755 (1961), affirmed per curiam 296 F. 2d 925 (C.A. 3, 1962), certiorari denied 370 U.S. 910 (1962) ; and *Isabel A. Elliott*, 32 T.C. 283 (1959).

Our conclusion is not altered by virtue of Teragram's increased business activities which began around January 1965 when it acquired property in Waterbury, Conn., and contracted for the erection of a plant which it leased to RBS Connecticut, another steel company 100-percent owned by petitioners. While the fact that Teragram obtained the financing for this project through a mortgage on which it alone became liable is an indication of some independent business activity on the part of Teragram, it is by no means conclusive. Moreover, this increased business activity did not commence until the very year of the distribution of the Teragram stock to petitioners. To hold, on the basis of this increased activity in 1965, if such activity does in fact constitute the conduct of an active trade or business, that Teragram has been so engaged since 1960 would simply result in the defenestration of the requirements of section 355 (b).

---

[4] See and compare sec. 346(b)(1), requiring the active conduct of a trade or business for the 5-year period preceding a distribution ; sec. 1372(e)(5) defining "passive investment income" as gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom) ; and sec. 822(b) defining "gross investment income" as the gross amount of income during the taxable year from (A) interest, dividends, rents, and royalties, (B) the entering into of any lease mortgage, or other instrument or agreement from which the insurance company derives interest, rents, or royalties.

In their attempt to illustrate the separate active business of Teragram petitioners suggest that because of the multipurpose nature of Teragram's properties they could be easily rented or *sold* if RBS or RBS Connecticut decided to abandon them for some reason. It is just such a possibility of sale that has caught the awareness of the courts. In the *Bonsall* case at page 65, the Court of Appeals for the Second Circuit said:

> It is clear that careful scrutiny of purported "real-estate rental" businesses is necessary to prevent evasion of the purposes of the statute. The possibility of the shareholders abstracting accumulated earnings at capital gains rates is present whenever a corporation owns its own factory or office building. Under taxpayers' interpretation, all that need be done is to transfer the building to a new corporation and distribute the stock received in return. The shareholders would then be free to sell their stock and pay a capital gains rate on the proceeds while the corporation can rent or purchase another building and reduce its accumulated earnings. The present case is little more than that, and it is noteworthy that the two prior cases decided under this section other than Coady, Theodore F. Appleby, supra, and Isabel A. Elliott, supra, were likewise factually similar. Only long application may completely clarify the difficult terminology of section 355. But obvious cases such as presented here plainly must be excluded from tax-free treatment.

Here, after an easily arranged sale of Teragram's properties, petitioners would be free to liquidate Teragram or arrange a straight sale of their Teragram stock. The fact that this has not occurred is just as inconclusive as though a sale had taken place prior to trial. What is of crucial importance is that, regardless of the valid business purpose for such a transaction,[5] petitioners have extracted through an attempted tax-free spin-off what are in substance passive, investment-type assets. This transaction is a "bailout" of the earnings and profits of RBS and Teragram and to this extent constitutes a "device" for the distribution of such earnings and profits. Petitioners have failed to prove otherwise.

---

[5] See Whitman, "Draining the Serbonian Bog: A New Approach to Corporate Separations Under the 1954 Code." 81 Harv. L. Rev. 1243–1244, where this point is emphasized in a critique of the *Parshelsky* case:

"In Estate of *Moses L. Parshelsky* [236] the Service leaned heavily on the corporate/shareholder distinction in the business purpose doctrine. As might have been predicted from the repudiation in *Lewis* v. *Commissioner*,[237] this was at best a weak link in the enforcement chain, and the Second Circuit discarded it. But again emphasis upon business purpose obscured the real issue. Here, the seventy-two-year-old sole shareholder of a business with large accumulated earnings spun off real estate assets worth more than 350,000 dollars to himself, ostensibly to facilitate his estate planning. It was this 'shareholder purpose' that finally legitimatized the separation.[238] But the whole transaction seems to have been a bailout, artfully contrived, perhaps, but a bailout nonetheless. Had Parshelsky tried to obtain the earnings himself without paying a dividend tax, he would probably have failed to qualify for a valid spin-off; the device concept under the 1951 act was weak, but it did cover glaring post-distribution sales.[239] * * * Why then should the fact that he wanted to plot out his estate legitimatize a spin-off that would otherwise fail? Intent of the shareholder is relevant, but the statutory test speaks in terms of result, and the effect here has been a bailout. * * *" (Footnotes omitted.)

We are mindful of the fact that to some extent every corporate separation is a device for the distribution of earnings and profits insofar as there is direct ownership by the stockholders of something they did not previously hold directly.[6] However, what we must decide in this case is whether the transaction in question fits within the requirements of the statute and the expressed legislative purpose of providing "for non-recognition of gain or loss in cases which involve a mere rearrangement of the corporate structure or other shifts in the form of the corporate enterprise which do not involve any distributions of corporate assets to shareholders." H. Rept. No. 1337, 83d Cong., 2d Sess., p. 34 (1954) ; accord, S. Rept. No. 1662, 83d Cong., 2d Sess., p. 43 (1954). For the reasons stated herein, we conclude that there has not been a mere rearrangement in the form of the corporate enterprise and a functional division of two corporations engaged in the active conduct of separate trades or businesses for the 5-year period preceding the distribution of the Teragram stock to petitioners. Accordingly, we hold that the distribution of Teragram stock to petitioners in August 1965 does not satisfy the requirements of section 355.

*Decision will be entered for the respondent.*

