T.C. Memo. 1997-274


UNITED STATES TAX COURT


CLARK D. AND JANIS L. PULLIAM, Petitioners v.,
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12923-95.                    Filed June 17, 1997.



Robert J. Schuckit and Richard O. Kissel II, for
petitioners.

Russell D. Pinkerton for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:[1]  Respondent determined a deficiency of $245,732 in petitioners' Federal income tax for 1992, and an accuracy-related penalty of $49,146 under section 6662(a)[2] and 6662(b)(2) for a substantial understatement of income tax.

The principal issue for decision is whether the distribution by Pulliam Funeral Homes, P.C. (Homes) to petitioner Clark D. Pulliam of 1,000 shares of common stock in Pulliam Deckard Funeral Chapel, P.C. (Chapel) on January 1, 1992, constituted a distribution on which no gain or loss is recognized under the provisions of section 355.  The resolution of this issue depends upon whether the spin-off of Chapel from Homes was used principally as a device for the distribution of earnings and profits of Homes in contravention of section 355(a)(1)(B).  If the spin-off of Chapel from Homes was not used principally as a device for the distribution of earnings and profits, a new and alternative issue, not determined in the notice of deficiency and not pleaded in respondent's answer but first raised by respondent at trial and on brief, is whether Homes distributed enough stock

---

[1]  With the consent of counsel for the parties, the Chief Judge reassigned this case, after the death of Judge Irene F. Scott, to Judge Howard A. Dawson, Jr., for disposition on the existing record.

[2]  All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

in Chapel to constitute control within the meaning of section 368(c), as required by section 355(a)(1)(D).

The notice of deficiency sent to petitioners determined that, in the event it is decided that Mr. Pulliam did not receive dividends of $789,500 from Homes, Mr. Pulliam received $40,000 in 1992 as a downpayment on an installment sale of 49 percent of his stock in Chapel, which petitioners did not report on their Federal income tax return for that year.[3] This alternative determination was not placed in issue by petitioners. Likewise, petitioners did not allege errors in their petition with respect to the disallowance of a personal exemption deduction, an adjustment to itemized/standard deductions, and the assertion of an accuracy-related penalty under section 6662(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation, together with attached exhibits, are incorporated herein by this reference.

Clark D. Pulliam and Janis L. Pulliam (petitioners) resided in Robinson, Illinois, at the time they filed their petition in this case.

---

[3] According to Mr. Pulliam's testimony, the $40,000 was omitted from petitioners' Federal income tax return, but it was later reported and an advance payment was made on the deficiency determined for 1992.

Pulliam Funeral Homes, P.C. (Homes) is a corporation chartered in the State of Illinois and doing business in Crawford County, Illinois.  The business was founded in 1947 by Troy L. Pulliam, Jr.  It was incorporated as a professional service corporation in 1974.  Troy L. Pulliam, Jr., was the sole owner of Homes' stock from 1974 until his death in 1976.  His son, Clark D. Pulliam (Mr. Pulliam), purchased all the stock of Homes in 1976, and since that time he has been the sole shareholder, director, and president of Homes.  Mr. Pulliam is a licensed funeral director and embalmer in the State of Illinois.  He has served as coroner of Crawford County, Illinois.  He is a decorated Air Force veteran who served in Vietnam.

Prior to January 1, 1992, Homes operated three funeral homes located in the rural eastern Illinois towns of Robinson, Oblong, and Hudsonville.  Robinson has a population of about 7,200 and Oblong has a population of about 1,600.  Oblong is located approximately 8 miles west of Robinson.  The main offices of Homes are located in Robinson, where Mr. Pulliam has his personal office and manages all the Homes sites.  All three of the funeral homes are modern, well-maintained facilities.

Homes is a successful and profitable business.  In 1991 Mr. Pulliam was paid a salary of $181,400.  Prior to 1992, Homes had not paid any dividends, and it had unappropriated retained earnings of $1,112,445 on December 31, 1991.

On December 31, 1991, Mr. Pulliam owed Homes $219,337. The loans made to him had no stated interest rate and were payable on demand. They were used primarily to finance petitioners' new residence. They began building their new residence after completing the building and remodeling of Homes' funeral facilities.

The Oblong funeral home of Homes was originally built as a residence in 1920 and was converted to a funeral parlor in 1939. The last major renovation of the Oblong facility occurred in 1986.

The Oblong funeral home was given excellent appearance and maintenance ratings in the appraisal made by Vandelyn R. Pine, dated January 9, 1992.

The total number of funeral services conducted during the years 1986 through 1991 at the Oblong facility was as follows:

| 1986 | 1987 | 1988 | 1989 | 1990 | 1991 |
|------|------|------|------|------|------|
| 53 | 75 | 54 | 51 | 44 | 56 |

The number of funeral services conducted at the Oblong facility averaged between 60 and 70 funerals per year during the years 1992 and 1993.

Earl L. Deckard (Mr. Deckard), a licensed funeral director and embalmer in Illinois, was employed by Homes or Chapel from November 1980, until mid-1994. He worked at the Robinson facility through 1985, and then worked at the Oblong facility for the remainder of his employment.

From 1985 through 1989, Mr. Deckard lived in the upper level of the Oblong facility. He then moved into his own home. Beginning in 1985, he was the resident manager and embalmer at Oblong where he was in charge of day-to-day operations of the funeral home. He was the only full-time employee at the Oblong facility, although it had a part-time secretary and a part-time receptionist. Mr. Deckard also assisted at Homes' other facilities on an as needed basis.

Mr. Deckard was a key employee of Homes. He was well connected in both the Oblong and Robinson communities. He was raised in Oblong, graduated from high school there, and was a member of the community club, village board, and the police and fire commission. He was also a member of a large church.

Prior to 1991, Mr. Deckard had spoken to Mr. Pulliam about acquiring a financial interest in the Oblong facility. But Mr. Pulliam was not then interested in selling any of his ownership in Homes or Oblong until his son, David, had an opportunity to choose his vocation. Mr. Deckard was not interested in any minority ownership in Homes. He later so indicated in writing that he "had absolutely no interest in a minority interest in Pulliam Funeral Home, P.C.". Also prior to 1991, Mr. Pulliam and Mr. Deckard had some disagreements regarding the operation of the Oblong facility. Consequently, in early 1991, Mr. Deckard purchased property adjacent to his residence on which he intended to construct and operate his own funeral home in Oblong.

Mr. Pulliam discovered that Mr. Deckard had purchased the property in Oblong and that he planned to construct and operate a funeral home in competition with Homes. This would have caused Homes to lose a key employee. Homes would also have lost business in the small market area of Oblong and vicinity, and it would have had an adverse impact on its profits.

Upon learning of Mr. Deckard's intent, Mr. Pulliam summarily terminated his employment in July 1991. He then requested his attorney, Max Tedford (Mr. Tedford), to prepare a formal termination letter to Mr. Deckard.

After Mr. Deckard's employment was terminated, Mr. Pulliam experienced some problems in the Oblong facility. He and Mr. Tedford discussed what could be done to rectify the situation. Mr. Tedford advised him and suggested that a negotiation meeting with Mr. Deckard be arranged.

A meeting was held in July 1991 in Mr. Tedford's office, attended by Mr. Pulliam, Mr. Deckard, and their wives. An informal agreement was reached whereby Mr. Deckard would acquire an ownership interest in the Oblong facility and would be reemployed at a salary and bonus. The corporate minutes of Homes, dated July 2, 1991, stated as follows:

> The sole stockholder and director of Pulliam Funeral
> Homes, PC., conducted a special meeting of said
> Corporation at the Corporate offices at 1005 West Main
> St., Robinson, Illinois, for the purpose of considering
> an offer from long-time employee Earl L. Deckard to
> purchase an interest in the business of Oblong,
> Illinois. After consideration, it was decided that Mr.

Deckard could purchase up to 49% of the Oblong location, after a spin-off from Pulliam Funeral Homes, P.C., into Pulliam-Deckard Funeral Chapel, P.C., in which Clark D. Pulliam would be the sole stockholder, and from which up to 49% of the stock could be sold to Earl L. Deckard.

It was decided to use Vanderlyn R. Pine and Associates to do the appraisal and all fees and costs associated with the spin-off and sale would be borne by the buyer and seller on a 51-49 split.

It was further agreed that January 1, 1992 would be the preferred target date to coincide with Calendar year-end and that progress towards that sale would be easily accomplished.

A sale price to be established by appraisal will be agreed to in writing by the parties and all accounting and legal matters resolved prior to sale.

After the July meeting, Mr. Pulliam provided his accountants, Kemper CPA Group, and his lawyer, Mr. Tedford, with information and data, and requested that they plan the transactions and prepare the necessary written agreements.

Mr. Pulliam, his attorney, and his accountants agreed on the spin-off and other transactions before the formation of Chapel and the distribution of all its stock to Mr. Pulliam. He selected and contacted the appraiser, Vanderlyn R. Pine. He was billed for the $5,950.76 appraisal fee. He contacted and hired the attorney, Mr. Tedford, and the accountants, Kemper CPA Group. Mr. Tedford had three conferences with Mr. Pulliam between December 2, 1991, and February 28, 1992. Mr. Tedford had no contacts with Mr. Deckard during that period. All of the agreements were prepared by Mr. Tedford. All of the agreements

were structured by Mr. Tedford and the accountants.  Mr. Deckard was unrepresented in the transactions.

A Spin-off Agreement executed by Mr. Pulliam and Mr.. Deckard on January 1, 1992, provided, in pertinent part, as follows:

> WHEREAS, PULLIAM FUNERAL HOMES, P.C. is currently engaged in the funeral business in Crawford County, Illinois, and
> WHEREAS, CLARK D. PULLIAM is the sole shareholder of PULLIAM FUNERAL HOMES, P.C. and
> WHEREAS, PULLIAM FUNERAL HOMES, P.C. proposes to transfer to PULLIAM DECKARD FUNERAL CHAPEL, P.C. the real estate and improvements, and other assets set forth on Exhibit A attached, heretofore used by it in that portion of its business operation situated in Oblong, Illinois, in return for all the issued and outstanding shares of PULLIAM DECKARD FUNERAL CHAPEL, P.C. and to simultaneously transfer to CLARK D. PULLIAM, the sole shareholder of PULLIAM FUNERAL HOME, P.C. all of said outstanding and issued shares of PULLIAM DECKARD FUNERAL CHAPEL, P.C. and
> WHEREAS, PULLIAM FUNERAL HOME, P.C. and PULLIAM DECKARD FUNERAL CHAPEL, P.C. are desirous of entering into an agreement for the purpose of securing the transfer to PULLIAM DECKARD FUNERAL CHAPEL, P.C. of the above-described assets of PULLIAM FUNERAL HOMES, P.C. and the ultimate transfer to the sole shareholder of PULLIAM FUNERAL HOMES, P.C. * * * of the issued and outstanding shares of PULLIAM DECKARD FUNERAL CHAPEL, P.C.
> NOW, THEREFORE, in consideration of mutual covenants and undertakings of the respective parties hereto, it is agreed as follows:
> 1.  PULLIAM FUNERAL HOMES, P.C. does hereby agree to transfer into PULLIAM DECKARD FUNERAL CHAPEL, P.C., effective January 1, 1992, all of those assets more particularly identified on Exhibit A which is attached hereto and incorporated herein by this reference.
> 2.  Simultaneous with the transfer of the assets as provided for in paragraph 1 above, PULLIAM DECKARD FUNERAL CHAPEL, P.C. agrees to transfer to PULLIAM FUNERAL HOMES, P.C. all of the issued and outstanding shares of stock of PULLIAM DECKARD FUNERAL CHAPEL,

P.C., which in turn will transfer said shares to its sole shareholder, CLARK D. PULLIAM.

3. It is the intention of all parties hereto that no gain or loss for income tax purposes will be recognized in that said transaction shall constitute a "spin-off" pursuant to Section 355 of the Internal Revenue Code and accordingly it is agreed that the value of the assets transferred shall be their tax basis value as determined by Kemper CPA Group.

An Agreement dated February 28, 1992, to be effective January 1, 1992, was signed by Mr. Pulliam and Mr. Deckard. The Agreement incorporated a Stock Purchase Agreement and an Employment Agreement. The Agreement also provided, in pertinent part, as follows:

WHEREAS, PULLIAM owns 100 percent (1000 shares) of the common stock of PULLIAM DECKARD FUNERAL CHAPEL, P.C., an Illinois Corporation; and

WHEREAS, DECKARD desires to purchase from PULLIAM, and PULLIAM desires to sell to DECKARD 49 percent (490 shares) of the common stock of PULLIAM DECKARD FUNERAL CHAPEL, P.C., an Illinois Corporation.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings of the respective parties hereto, it is agreed as follows:

1. DECKARD agrees to purchase from PULLIAM, and PULLIAM agrees to sell to DECKARD 49 percent (490 shares) of the common stock of PULLIAM DECKARD FUNERAL CHAPEL, P.C., an Illinois Corporation, for the sum of $789.00 per share, for a total of $386,610, payable by DECKARD to PULLIAM as follows:

A. $40,000 upon execution of this Agreement, the receipt and sufficiency of which is hereby acknowledged.

B. The remaining balance of $346,610, together with interest thereon at the rate of 10 percent per annum amortized over a period of 15 years, shall be paid by DECKARD to PULLIAM in equal annual installments of $45,570.13, which includes principal and interest, beginning March 15, 1993, and the same amount on the same date of each year thereafter until March 15, 2002, at which time the entire remaining balance of principal and interest owing under this Agreement must be paid in full. Payment shall be

applied first to pay interest and then to reduce principal.

\* \* \* \* \* \* \*

D. Concurrently with the execution of this Agreement, PULLIAM shall deliver the stock being sold to DECKARD to The First National Bank in Robinson as escrow agent, said stock to be endorsed in blank for transfer. Said escrow agent shall hold the stock being sold until satisfactory proof has been furnished to the escrow agent that the purchase price hereunder, together with interest as herein provided, has been fully paid, and upon satisfactory proof of payment of the purchase price in full shall deliver such stock to DECKARD. If DECKARD shall fail to make any installment payment when due and shall not correct such failure within 90 days thereafter, following notice by PULLIAM, then at the option of PULLIAM this Agreement shall be terminated. Upon termination, the parties shall cause a portion of the stock covered by this Agreement to be transferred to DECKARD, said portion being the amount which DECKARD has made principal payments on based upon a price per share of $789.00 excluding any fractional shares. The balance of the stock shall be transferred to PULLIAM. The escrow agent may conclusively rely on the Affidavit of PULLIAM that DECKARD is in default hereunder and of PULLIAM's election to terminate this Agreement. It is understood and agreed by all parties hereto that the escrow agent assumes no personal liability except for fraud knowingly committed. The escrow agent shall be entitled to a reasonable fee for his services under this Agreement. The cost of such fee shall be shared equally by PULLIAM and DECKARD and shall be paid directly to the escrow agent as and when billed.

E. So long as DECKARD shall not be in default under the provisions of this Agreement, he shall have all of the voting and other customary rights of a shareholder of record with respect to the stock being purchased from PULLIAM. In the event DECKARD shall be in default under the provisions of this Agreement, then his voting and other rights shall cease and such rights shall be vested in PULLIAM..

F. During the term of this Agreement, neither DECKARD nor PULLIAM shall take any action to cause any additional shares of common capital stock of the Corporation to be issued.

\* \* \* \* \* \* \*

3.  All costs relating to the formation and organization of PULLIAM DECKARD FUNERAL CHAPEL, P.C., an Illinois Corporation, including but not limited to all documents preparation expenses, all legal fees, accounting fees, real estate and income taxes, appraisal fees, postage, fax charges, federal express costs, travel expenses and all other costs incurred shall be paid by the parties on a prorata basis in relation to their respective stock ownership.  Any of said expenses paid in advance by PULLIAM or PULLIAM FUNERAL HOMES, P.C. shall likewise be reimbursed to PULLIAM or to PULLIAM FUNERAL HOMES, P.C. on said prorata basis.

4.  DECKARD agrees not to compete with PULLIAM or PULLIAM FUNERAL HOMES, P.C., under the same terms and conditions as are contained in Paragraph 7 of the EMPLOYMENT AGREEMENT attached hereto and incorporated herein by this reference as Exhibit B.  For a period of three years from the date of this agreement, PULLIAM, individually and on behalf of PULLIAM FUNERAL HOMES P.C., agrees not to compete with PULLIAM DECKARD FUNERAL CHAPEL, P.C., for funeral business in Oblong, Illinois.

*    *    *    *    *    *    *

13.  This agreement shall be governed by the laws of the State of Illinois.

The $789 per share fair market value of Chapel's stock was based on the appraisal report of Vanderlyn R. Pine dated January 9, 1992, which determined that the total fair market value of the Oblong facility was $789,500.  The net taxable basis of the Oblong facility was $227,274.09 as of December 31, 1991.  Chapel had total assets of $301,871, total liabilities of $43,124.56, and retained earnings of $258,746.44 as of December 31, 1992, according to a financial statement prepared by the Kemper CPA Group.

On January 1, 1992, a spin-off of Homes' assets and liabilities with respect to the Oblong funeral home was

consummated.  Chapel was incorporated as a professional corporation to accept transferred assets and liabilities from Home.  A professional service corporation license was issued to Chapel by the State of Illinois.

On January 1, 1992, Homes received 1,000 shares of Chapel common stock, and on the same date distributed the 1,000 shares of Chapel stock to Mr. Pulliam as its sole shareholder.  Also on January 1, 1992, the 1,000 shares of Chapel common stock were surrendered by Mr. Pulliam in exchange for two certificates:  No. 2 for 510 shares and No. 3 for 490 shares.

On March 6, 1992, Mr. Pulliam transferred certificate No. 3 to the First National Bank of Robinson as escrow agent pursuant to the Agreement and Stock Purchase Agreement between him and Mr. Deckard.  Mr. Pulliam received the initial $40,000 payment from Mr. Deckard in 1992 pursuant to the Agreement.

By the terms of the Employment Agreement Mr. Deckard was to provide management and other services as funeral director and assist in the overall operation and supervision of the Oblong facility, and to preserve and increase its goodwill.  His compensation was $39,000 per year.  It contained, among other provisions, a covenant not to compete with Chapel for a period of 3 years after the termination of his employment.  It also contained a non-solicitation clause and a covenant for the protection of confidential information.

Homes and Chapel were engaged immediately after the distribution in the active conduct of the funeral business.

The funeral business was actively conducted by Homes throughout the 5-year period ending on the date of the distribution.

In 1993 Mr. Deckard paid his first annual installment of $45,570.13 to Mr. Pulliam under the Agreement. Petitioners timely paid taxes on that installment payment.

Mr. Deckard defaulted in 1994 on the installment sale. His employment by Chapel then ended. He demanded that Mr. Pulliam return the payments he had made, but later settled for $5,000. After defaulting, Mr. Deckard abided by his covenant not to compete with Chapel, which prevented him from working as a funeral director in Oblong. Mr. Pulliam reacquired almost all of Chapel's common stock as the result of Mr. Deckard's default under the terms of paragraphs 1 D and E of their Agreement.

At all times after Chapel was created as a professional corporation, Mr. Pulliam was president and majority owner of Chapel's stock, and was in ultimate control of its operations.

In the notice of deficiency respondent determined that Mr. Pulliam received dividends of $789,500 from Homes, which were not reported on petitioners' Federal income tax return for 1992. Therefore, their taxable income was increased $789,500.

OPINION

A corporation generally must recognize gain on the sale or distribution of appreciated property, including stock of a subsidiary.  However, distributions of subsidiary stock in divisive transactions governed by section 355[4] are tax-free to

---

[4]      SECTION 355.  DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.
  (a)  Effect on Distributees.-
  (1)  General Rule.-If-
    (A)  a corporation (referred to in this section as the "distributing corporation")-
        (i)  distributes to a shareholder, with respect to its stock, or
        (ii) distributes to a security holder, in exchange for its securities,

solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,
    (B)  the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),
    (C)  the requirements of subsection (b) (relating to active businesses) are satisfied, and
    (D)  as part of the distribution, the distributing corporation distributes-
        (i)  all of the stock and securities in the controlled corporation held by it immediately before the distribution, or
        (ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,
                                        (continued...)

both the distributing corporation and to the distributee shareholders.

There are four basic statutory requirements that must be satisfied to have a tax-free corporate division under section 355. They are: (1) Solely stock or securities of a controlled corporation must be distributed to shareholders with respect to their stock in the distributing corporation or to security holders in exchange for the distributing corporation's securities; (2) the distribution must not be used principally as a device for distributing earnings and profits; (3) the active business requirement of section 355(b) must be met; and (4) all of the controlled corporation's stock and securities held by the distributing corporation, or enough to constitute control of the controlled corporation, must be distributed. In addition to the statutory requirements, a corporate business purpose requirement and a continuity of proprietary interest requirement apply to spin-offs. Secs. 1.355-1(b), 1.355-2(b) and (c), Income Tax Regs.

## Petitioners' Contentions

Petitioners contend that the spin-off by Homes of the Chapel stock to Mr. Pulliam qualifies as a tax-free distribution pursuant to section 355. They argue that there were strong

[4](...continued)
then no gain or loss shall be recognized to (and no amount shall be includable in the income of) such shareholder or security holder on the receipt of such stock or securities.

- 17 -

corporate business purposes for Homes to create Chapel because it wanted to protect itself from any possible competition by Mr. Deckard in the funeral business in the Oblong area, and it wanted to reemploy Mr. Deckard as a key employee to operate and manage the Oblong facility.  They also argue that Homes had to distribute Chapel's stock to Mr. Pulliam because it was believed that Illinois law required funeral homes to be professional service corporations having shareholders who are licensed by the State of Illinois as funeral directors and embalmers.  Thus, petitioners maintain that both of these corporate business purposes are strong evidence of nondevice which overcomes the evidence that there was principally a device for the distribution of the earnings and profits of Homes or Chapel or both.

Respondent's Contentions

To the contrary, it is respondent's position that this transaction fails to qualify as a tax-free distribution of stock under section 355 and the applicable regulations.  Respondent argues that there was no corporate business purpose for the distribution by Homes of Chapel stock to Mr. Pulliam, and that there was no compelling reason to distribute Chapel's stock to Mr. Pulliam other than to distribute substantial earnings and profits of Homes to Mr. Pulliam without being subject to the dividend provisions of section 301.  It is further argued that, when Homes distributed the Chapel stock, Illinois law relating to funeral homes did not require that Chapel be a professional

service corporation, whose shareholders are licensed funeral directors and embalmers, rather than a regular corporation. Thus, respondent contends that various devices present here clearly show that the transaction was used principally as a device for the distribution of Homes' earnings and profits. In addition, respondent asserts that the business objectives of Homes could have been satisfied without a distribution to Mr. Pulliam either by having Mr. Deckard purchase 49 percent of the Chapel stock from Homes or by having Mr. Deckard purchase newly issued Chapel stock from Chapel.

Device and Nondevice

At the outset it is important to note that, after a spin-off, a shareholder can sell or exchange stock in either the spin-off corporation or the distributing corporation in a transaction qualifying for capital gains treatment. The shareholder will get this favorable capital gains treatment even though he continues to hold stock representing part of his investment. Therefore, under certain circumstances, a spin-off can be used to avoid the ordinary income tax treatment imposed on dividends to bail out corporate earnings. Although the differences between the treatment of capital gains and ordinary income have narrowed since section 355 was first enacted, capital gains treatment continues to be preferable in certain respects. Because of continuing Congressional concern that a spin-off might be used to avoid the tax on dividends, section 355(a)(1)(B) provides that a

spin-off cannot qualify as tax-free if it is used principally as a "device" to distribute earnings and profits.

Whether the distribution in this case qualifies as tax-free under section 355 turns upon the answer to the narrow question of whether the device factors present in the transaction outweigh the nondevice factors. If the device factors are predominant, the spin-off cannot qualify as tax-free because it has been used principally as a device for the distribution of earnings and profits of the distributing corporation (Homes) or the controlled corporation (Chapel) or both. On the other hand, if the nondevice factors are strong enough to overcome the device factors, the spin-off will qualify as tax-free. Sec. 1.355-2(d)(2) and (3), Income Tax Regs. The determination must be based on all the facts and circumstances. Sec. 1.355-2(d)(1), Income Tax Regs.

Device Factors

A sale of stock after a spin-off is "evidence of device". Sec. 1.355-2(d)(2)(iii)(A), Income Tax Regs. A subsequent sale of stock pursuant to an arrangement negotiated or agreed upon before the distribution is "substantial evidence of device". Sec. 1.355-2(d)(2)(iii)(B), Income Tax Regs. In this case it was clearly prearranged that, after the spin-off of stock in Chapel to Mr. Pulliam, he would make an installment sale of 490 shares of that stock to Mr. Deckard. Thus, there is substantial evidence of device.

Generally, the greater the percentage of the stock sold after the distribution, the stronger the evidence of device.  In addition, the shorter the period of time between the distribution and the sale, the stronger the evidence of device.  Sec. 1.355-2(d)(2)(iii), Income Tax Regs.  Here 49 percent of Chapel's stock was sold to Mr. Deckard, and the distribution and the sale of stock were both deemed to have taken effect as of January 1, 1992.  In no event did the sale take place later than March 6, 1992, when 490 shares of Chapel stock were placed in escrow with the First National Bank of Robinson pursuant to the Agreement and Stock Purchase Agreement between Mr. Pulliam and Mr. Deckard.

Mr. Pulliam, through his attorney and accountants, completely dominated, controlled, and arranged the creation of Chapel and the transfer of all of its shares directly to himself. By contrast, Mr. Deckard was unrepresented and did not significantly influence the structuring of the transaction or the preparation of the legal documents.

Nondevice Factors

Among nondevice factors is a corporate business purpose. Sec. 1.355-2(d)(3)(ii), Income Tax Regs.  Since any spin-off must have a corporate business purpose to qualify as tax-free, this nondevice factor will always be present to some extent in any qualifying spin-off.  Under the balancing approach adopted in the regulations, the stronger the evidence of device, the stronger the corporate business purpose that is necessary to prevent a

determination that the transaction was used principally as a device.  Id.  Factors that are relevant in weighing the strength of the business purpose include:  (1) The importance of achieving the purpose to the success of the business; (2) the extent to which the transaction is prompted by a person not having a proprietary interest in either corporation, or by other outside factors beyond the control of the distributing corporation; and (3) the immediacy of the conditions prompting the transaction. Sec. 1.355-2(d)(3)(ii)(A),(B) and (C), Income Tax Regs.  As reflected in our findings of fact, two strong corporate business purposes for the spin-off are present in this case.  If Mr. Deckard had carried out his plans to build and operate a funeral home in Oblong in competition with Homes it would have divided the funeral business in that area, thus having an adverse impact on Homes' profits.  In addition, the services of an experienced funeral director and key employee (Mr. Deckard) would have been lost to the Homes organization.  These purposes were vitally important to the continued success of Homes' business.  The transaction was prompted by the actions of Mr. Deckard, who had no proprietary interest in Homes at that time.  The immediate possible threat of competition to Homes in Oblong prompted the transaction.

Independent Corporate Business Purposes

Section 1.355-2(b)(1), Income Tax Regs., provides an affirmative requirement that a spin-off have one or more

corporate business purposes. This is independent of the device test. The requirement limits tax-free treatment under section 355 to spin-offs motivated by non-tax business reasons, and thus prevents tax avoidance opportunities from arising. Id. Section 1.355-2(b)(2), Income Tax Regs., defines a corporate business purpose as a real and substantial non-Federal tax purpose germane to the distributing corporation, the controlled corporation, or the affiliated group to which the distributing corporation belongs. Although respondent maintains that a purely shareholder purpose will not support a tax-free spin-off, there are some situations in which a shareholder purpose may be so intertwined with a corporate business purpose that it is not practical to separate the two. In such a case, the transaction is considered carried out for a corporate business purpose. Sec. 1.355-2(b)(2), Income Tax Regs. See Estate of Parshelsky v. Commissioner, 303 F.2d 14 (2d Cir. 1962), reversing and remanding 34 T.C. 946 (1960), on remand T.C. Memo. 1963-187, holding that a shareholder non-tax purpose may be an adequate business purpose for a spin-off. See also Rafferty v. Commissioner, 452 F.2d 767 (1st Cir. 1971), affg. 55 T.C. 490 (1970), and Wilson v. Commissioner, 353 F.2d 184 (9th Cir. 1965), reversing and remanding 42 T.C. 914 (1964), which approached the business purpose issue from different theoretical bases. In Rafferty, evidence of lack of business purpose was considered by the Court of Appeals as bearing on the "device" requirement. In Wilson,

the Court of Appeals assumed that a spin-off must satisfy an independent business purpose test.  However, both courts reached the same practical result; i.e., a spin-off with a strong bailout potential will qualify under section 355 only if compelling business purposes for the spin-off can be shown.

In this case, as we have previously indicated, independent corporate business purposes existed for the transaction.  The protection against competition and the retention of a key employee are both strong and compelling business purposes, not only for Homes but also for Mr. Pulliam, its sole shareholder.

Respondent stresses that there must be a business purpose not only for dividing the business into separate corporations, but also for direct ownership of the corporations by the shareholders.  See Estate of Parshelsky v. Commissioner, 303 F.2d at 20; Bonsall v. Commissioner, 317 F.2d 61, 65 (2d Cir. 1963), affg. T.C. Memo. 1962-151.  Petitioners assert that they believed Illinois law required Chapel's shareholders to be individuals, who were licensed funeral directors and embalmers, rather than a corporation, and therefore it was necessary to create Chapel as a professional service corporation with Mr. Pulliam owning its stock before the installment sale of 490 shares to Mr. Deckard. Respondent disputes this assertion as being incorrect and misleading.  It is argued that Illinois law did not require Homes to distribute Chapel's stock to Mr. Pulliam, but it could have held the stock in Chapel and sold 490 shares directly to Mr.

Deckard. Thus, respondent argues, "the unnecessary use of a professional service corporation, coupled with the specious argument that a professional service corporation was required by Illinois law, demonstrates an obvious attempt to structure the transaction to avoid the provisions of section 355(a)(1)(B)".

We agree with petitioners. Mr. Pulliam's attorney and accountants reasonably believed that it was necessary to create Chapel as a professional service corporation, and in our judgment their belief was well founded. It is unlawful for any person to practice, or attempt to practice, funeral directing and embalming in the State of Illinois without being licensed by that State. 225 Ill. Comp. Stat. 41/5-5 and 41/10-5 (West 1993). No corporation, partnership, or association of individuals, as such, shall be issued a license as a licensed funeral director and embalmer. However, nothing in the Illinois Funeral Directors and Embalmers Licensing Act restricts licensees from forming professional service corporations under the Illinois Professional Service Corporation Act or from having these corporations registered for the practice of funeral directing. 225 Ill. Comp. Stat. 41/15-50 (West 1993). Therefore, the only way to incorporate Chapel was through a professional service corporation. A professional corporation means a corporation organized under the Illinois Professional Service Corporation Act solely for the purpose of rendering one category of professional service, and which has as its shareholders only individuals who

are duly licensed by the State of Illinois.  805 Ill. Comp. Stat. 10/3.4 (West 1993).  No corporation organized under the Illinois Professional Service Corporation Act may issue any of its capital stock to anyone other than an individual who is duly licensed. 805 Ill. Comp. Stat. 10/11.  In order to open, operate, or maintain an establishment under the Professional Service Corporation Act, the corporation must have a certificate of registration.  One requirement for obtaining the certificate of registration is that the shareholders must be licensed.  805 Ill. Comp. Stat. 10/12 (West 1993).

Although unlicensed owners of funeral directing and embalming establishments are allowed under 225 Ill. Comp. Stat 41/1-20 (West 1993), the unlicensed owner is not allowed to "engage in any form of funeral directing and embalming".  225 Ill. Comp. Stat. 41/1-20(b) (West 1993).  In addition, 805 Ill. Comp. Stat. 10/4 (West 1993) provides that the provisions of the Professional Service Corporation Act do not repeal, modify, or restrict provisions of law that regulate several professions "except insofar as such laws are in conflict with the provisions of this Act [the Professional Service Corporation Act]".  This language indicates that the Professional Service Corporation Act controls in any real or perceived conflict between the Illinois code provisions regarding unlicensed owners.  Hence unlicensed ownership of a professional service corporation engaged in

funeral directing seems to be barred by 805 Ill. Comp. Stat. 10/15 (West 1993).

Arguably under these Illinois corporate requirements, we think that initially only Mr. Pulliam (and later Mr. Deckard) could have held Chapel's stock. Homes could not have done so. Consequently, Homes' distribution of Chapel's stock to Mr. Pulliam had a definite business purpose.

Section 1.355-2(b)(3), Income Tax Regs., states that a distribution is not carried out for a valid corporate business purpose if the business purpose can be achieved through a nontaxable transaction that does not involve the distribution of stock of a controlled corporation and which is neither impractical nor unduly expensive. In the circumstances of this case we think the corporate business purpose of bringing Mr. Deckard back as a key employee of the Oblong facility and providing him with a minority interest in Chapel could not have been achieved without an installment sale because of Mr. Deckard's financial condition and the Illinois Professional Corporation Act requirement that licensed individuals be the stockholders of Chapel. Homes could not have owned the Chapel stock during the installment sale. Consequently, we reject respondent's arguments that the business objectives of Homes could have been achieved in a nontaxable transaction without a distribution of Chapel stock to Mr. Pulliam.

Both parties have cited and relied on various revenue rulings. We have considered them, but find that they are factually distinguishable from this case. Hence we have placed no reliance on them in reaching our conclusion.

We also find Example (1) of section 1.355-2(d)(4), Income Tax Regs., to be distinguishable from the facts of the instant case. In Example (1) corporation X, whose stock was owned solely by individual A, distributed the stock of Y, a wholly owned subsidiary of X, to A, so that individual B, a key employee, could afford to purchase stock in X. After the distribution of the Y stock, A sold some of his X stock to B. Because X could have issued additional shares to give B an equivalent interest in X, the sale of X stock by A is deemed to be substantial evidence of device, and the transaction is considered to be used principally as a device. Here, by contrast, no additional stock could have been issued by Homes because Mr. Deckard did not want Homes' stock, Homes could not be a stockholder of Chapel under Illinois law, Mr. Pulliam and Homes would not sell Homes' stock to Mr. Deckard, and, in any event, Mr. Deckard could not afford to purchase any meaningful amount of Homes' stock. The entire distribution in Example (1) of section 1.355-2(d)(4), Income Tax Regs., was made so that the key employee could afford to buy stock in the distributing corporation, as opposed to the controlled corporation in this case. As a result, the fact

pattern in Example (1) is different from the situation present in the instant case.

Conclusions

Based on all the facts and circumstances present in this record, we conclude, on balance, that the strong corporate business purposes and nondevice factors outweigh and overcome the device factors, so that the distribution by Homes of Chapel stock to Mr. Pulliam qualifies as tax-free under section 355.  However, we sustain respondent's determination that petitioners are taxable on the $40,000 received in 1992 from Mr. Deckard on the installment sale of 49 percent of Chapel's stock, which they did not report on their Federal income tax return for that year.  Petitioners are also liable for the accuracy-related penalty under section 6662(a) with respect to the $40,000 omitted from their 1992 return.

Respondent raised a new and alternative issue for the first time at trial and on brief.  That issue is whether Homes, in substance, distributed enough stock in Chapel to constitute control within the meaning of section 368(c), as required by section 355(a)(1)(D).  This was not an issue or ground contained in the notice of deficiency or in respondent's answer to the petition.  Respondent filed no amendment to the answer raising this issue.  Petitioners have opposed the untimely raising of this issue.  We agree with petitioners.  We conclude that the issue is not properly before us and therefore we need not

consider it. Rule 31(a) specifically provides that "The purpose of the pleadings is to give the parties and the Court fair notice of the matters in controversy and the basis for their respective positions." See also Rule 36(b); Seligman v. Commissioner, 84 T.C. 191, 197-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986); Barber-Greene Americas, Inc. v. Commissioner, 35 T.C. 365, 390 (1960); Kaplan v. Commissioner, 21 T.C. 134, 147 (1953).

To reflect uncontested determinations and our conclusions with respect to the disputed issues,

Decision will be entered

under Rule 155.